Johnnie JOHNSON, Jr., et al., Plaintiffs,

v.

The CITY OF ALBANY, GEORGIA, a Municipal Corporation, et al., Defendants.

Civ. A. No. 1200.

United States District Court,
M. D. Georgia,
Albany Division.

May 6, 1976.

C. B. King, King & Phipps, Herbert E. Phipps, Albany, Ga., for plaintiffs.

James V. Davis, Landau & Davis, Albany, Ga., for defendants.

OWENS, District Judge.

In the fall of 1971 plaintiff Julian Arthur Mayo, a City of Albany water department employee since 1955, and plaintiff Johnnie Johnson, a City of Albany public works

department employee since 1958, through the Albany, Georgia, labor council contacted the Laborers International Union of North America, AFL/CIO, and as a result that union sent two of its full-time paid organizers—E. G. Bartlett and Alfred Hazel—to Albany during late 1971 to talk with them and other city employees about organizing city employees. Mr. Bartlett and Mr. Hazel met with a group of city employees and learned of their employee concerns which included segregated restrooms, segregated water fountains and blacks being paid less than whites for the same job. After the initial meeting Mr. Bartlett and Mr. Hazel remained in Albany and began meeting at least weekly with city employees. Those meetings were held to convince city employees that their concerns could best be remedied by joining and being represented by the Laborers International Union. In late March or early April Mr. Bartlett, Mr. Hazel and various employee representatives requested and obtained a private meeting with the late Mayor Motie M. Wiggins. No other city officials were present. According to Mr. Bartlett, he as the spokesman told Mayor Wiggins "of the conditions that prevailed in the City of Albany, discrimination relative to rates, the segregated restrooms and other areas of the city, the problems. I asked him for—we wanted a way of achieving recognition either by an election or by card check. He questioned whether we represented them or not and I showed him a stack of possibly two hundred and some odd authorization membership cards. He said that he did not have the authority to recognize us but would get us a meeting with the full council . . . ." Record at 41.

A few days later on April 5, 1972, a meeting was held between the Mayor, Albany's five Commissioners, Mr. Bartlett, Mr. Hazel and employee representatives. Other city officials including City Manager S. A. Roos were present. A tape recording, Exhibit D–3, of that meeting shows that Mr. Bartlett acted as chief spokesman. The meeting lasted about thirty minutes and included both Mr. Bartlett's impassioned plea for union recognition and questions asked by city officials and answered by Mr. Bartlett and Mr. Hazel. Mr. Bartlett mentioned that employees had many grievances and when questioned about those indicated that the main grievance was unequal treatment. While grievances were mentioned Mr. Bartlett always returned to and stuck with his request for a bargaining agreement with the city to include an agreement not to strike and compulsory arbitration of grievances. Mr. Bartlett identified the employees he represented as being blue collar employees of the public works and water, gas and light departments. Asked what would happen if the city chose not to negotiate, Mr. Bartlett responded that the decision would be left to the members of Local 1309, an already chartered local union composed of these blue collar workers. Questioned extensively on whether or not the City of Albany could legally recognize and bargain with a union, Mr. Bartlett suggested they could, and Mayor Wiggins indicated he had been told by a labor lawyer that the city could not. With Mr. Bartlett stressing the benefits of union recognition to the city and its employees—"if you work for a living, you need a union to represent you"— the meeting concluded with an indication from Mayor Wiggins that the matter would be taken under advisement.

By letter dated April 18, 1972, Exhibit D–2, the City of Albany advised that a decision was made that morning to deny the request of Laborer's Local 1309 for recognition and collective bargaining.

The following day, Wednesday, April 19, plaintiff Johnnie Johnson in the early morning got into a dispute with his boss, Mr. Gilbert, the City Building Inspector, over not being paid the previous Friday pay-day for the two days he spent in connection with employee meetings. An argument ensued, and Mr. Gilbert told him "if you can't do what I say on my job you hit the gate." Record at 17. He told Mr. Gilbert "to take it as he wanted it and he said, 'You're fired', just like that." Record at 18. Plaintiff Johnson told other employees of being fired, and other black employees walked off the job. As he described it:

"they said, 'If you go, we go.' . . . 'We are one hundred percent with you.'" Record at 18. The news of the firing of plaintiff Johnson and of the walkout spread rapidly and as fast as it spread black employees of the public works and water, gas and light departments walked off the job. At the peak of the walkout it is estimated that some 260 black employees had walked off.

After the walkout or strike began Mr. Hazel and about 100 black employees went to see City Manager Roos, met with him and asked what the city's position was. Mr. Roos asked Mr. Hazel and those present to request employees to come back to work and told them that those employees who fail to return to work within 24 hours would be fired. The Mayor and Commissioners had already adopted this policy, and the Water, Gas and Light Commission had concurred. The following Monday the city began hiring new employees to take the place of striking employees.

The strike continued; the city did not alter its position; the union furnished some money to the strikers; but soon they and the union ceased their efforts through striking to force the city to recognize and bargain with the union.

To the extent that job openings were available the city as to public works employees who returned within 90 days restored them to their former position without penalty other than subtraction of time absent from total time of employment.

Water, Gas and Light employees who returned within 90 days were rehired as if they were new employees thus losing all longevity credit for pay and employee benefit purposes. Of a total of 124 terminated, 48 public works employees were rehired, and of a total of 62 terminated, 23 Water, Gas and Light employees were rehired. On April 24, 1972, charges of employment discrimination in violation of 42 U.S.C. § 2000e were filed with the Equal Employment Opportunity Commission in behalf of plaintiffs Culbreath, Foggy, Johnson, Mayo and Roberts.

On August 31, 1972, Johnnie Johnson, Jr. and Ernest Culbreath, as public works employees and Willie Foggy, June Mayo, Lindberg Roberts and Julius Cobb, as Water, Gas and Light employees filed their complaint alleging a cause of action under 42 U.S.C. § 1981[1] and § 1983[2] and the Fourteenth Amendment[3] against the City of Albany, a municipal corporation; the individual persons then constituting the Board of City Commissioners, to wit: Motie Wiggins, Proctor M. Johnson, Jr., T. W. McCorkle, B. C. Gable, Harry Goldstein, Richard H. Rhodes and J. B. Lanier; S. A. Roos, City Manager; the Water, Gas and Light Commission of the City of Albany; the individual members of the Board of the Water, Gas and Light Commission, to wit: James B. Holloway, Walter Keenan, Sam Meeks and William P. Westbrook; and W. W. Rodemann, General Manager of the Water, Gas and Light Commission. In their complaint they sought to proceed individu-

1. § 1981. *Equal rights under the law*
 All persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts, to sue, be parties, give evidence, and to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens, and shall be subject to like punishment, pains, penalties, taxes, licenses, and extractions of every kind, and to no other.

2. § 1983. *Civil action for deprivation of rights*
 Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to

the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress.

3. Amend. 14—Section 1. All persons born or naturalized in the United States, and subject to the jurisdiction thereof, are citizens of the United States and of the State wherein they reside. No State shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States; nor shall any State deprive any person of life, liberty, or property, without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws.

ally and as representatives of all others similarly situated pursuant to Rule 23 of the Federal Rules of Civil Procedure, the class action rule.

On April 13, 1975, the Department of Justice of the United States by letter advised those plaintiffs in whose behalf EEOC complaints were filed of their right to sue under 42 U.S.C. § 2000e, and their complaint was amended to allege a cause of action thereunder.

■ Since a municipal corporation is not a person within the meaning of 42 U.S.C. §§ 1981 or 1983, *Bennett v. Gravelle*, 323 F.Supp. 203 (D.Md.1971), *aff'd*. 451 F.2d 1011 (4th Cir. 1971), the City of Albany has been dismissed as a party defendant as to those causes of action, but remains a defendant as to all other alleged causes of actions.

On the basis of stipulated facts the court determined by Order dated October 2, 1974, that this action could be maintained as a class action pursuant to Rule 23(a), (b)(2), and (3), Federal Rules of Civil Procedure. At the expense of plaintiffs individual "opt-out" class action notices were mailed by the clerk to all discharged black employees and all present black employees. Four hundred ninety-nine (499) notices were mailed. Of those 104 were returned undelivered and have not since been delivered. Of the 395 who received notices 79 requested exclusion from the class. The class therefore consists of a total of 316 persons. As finally defined it includes for purposes of injunctive relief "All past, present and future Black employees; including applicants for employment with the City of Albany or the Water, Gas and Light Commission" and for all other purposes "All past and present Black employees of the City of Albany or the Water, Gas and Light Commission." Order of March 8, 1976.

The plaintiffs allege that the defendants are engaged in a pattern or practice that discriminates on the basis of race against black job applicants, incumbent black employees and black dischargees. They allege that it was the pursuit of this discriminatory pattern or practice that caused the dis-

charge of black employees who were lawfully and constitutionally protesting the matters herein complained of. The defendants denied these allegations and further asserted that the firing or termination of black employees resulted solely from their unlawfully striking to coerce recognition of the union as their sole bargaining agent.

Following extensive discovery the case was heard by the court on March 2 and 3, 1976. The parties agreed that all depositions were to be considered by the court. Additional evidence was heard and received by the court. Everything presented having been considered the case is now ready for decision.

### JURISDICTION, CAUSES OF ACTION, and STANDING OF NAMED PLAINTIFFS

The six named individual plaintiffs who have been found to be representative parties of the class of former and present black employees each participated in the April 19, 1972 strike, did not return to work within the 90 day rehire period and are now employed elsewhere. The defendants assert that the named plaintiffs having each been lawfully discharged because of their participation in the strike have no possible remedy or claim and therefore cannot be representative parties of the class. This contention overlooks the following:

■ (a) On March 24, 1972, Title VII of the Civil Rights Act was made applicable to the City of Albany by Congress. 42 U.S.C. § 2000e. Named plaintiffs Roberts, Mayo, Culbreath, Johnson and Foggy regardless of the legality of their discharge, pursuant to that statute—which prohibits discrimination "against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin . . . " and which prohibits limiting, segregating, or classifying employees "in any way which would deprive or tend to deprive any individual of employment opportunities or otherwise adversely affect his status as an employee, because of such indi-

viduals' race, color, religion, sex, or national origin . . . " 42 U.S.C. § 2000e–2(a)(1) and (2),—have a cause of action[4] against the city of Albany as to the city's employment practices during the period beginning March 24, 1972, and ending with their discharge of April 19, 1972.

■ (b) The remainder of the defendants are individual persons acting under color of their municipal officers and authority, as to each of whom the named plaintiffs even if lawfully discharged have a cause of action under 42 U.S.C. §§ 1981[5] and 1983[6] for the two year period preceding the August 31, 1972, bringing of this lawsuit.[7]

■ (c) The five named plaintiffs having had charges filed in their behalf with EEOC, 42 U.S.C. § 2000e–5 having been complied[8] with, and the five named plaintiffs being entitled to sue the City of Albany, the class that they represent and of which they and plaintiff Cobb are also members, likewise has a cause of action against the City of Albany under 42 U.S.C. § 2000e. *Oatis v. Crown Zellerback Corp.,*

398 F.2d 496 (5th Cir. 1968), *Jenkins v. United Gas Corp.,* 400 F.2d 28 (5th Cir. 1968), *Johnson v. Georgia Highway Express, Inc.,* 417 F.2d 1122 (5th Cir. 1969), also see *Albemarle Paper Co. v. Moody,* 422 U.S. 405, 95 S.Ct. 2362, 45 L.Ed.2d 280, 294 n. 8 (1975).

■ These causes of action having been found to exist the court has jurisdiction under 28 U.S.C. §§ 1331(a),[9] and 1343(3) and (4).[10]

## ADDITIONAL FACTS

The City of Albany, a municipal corporation created in 1838, see Ga. Laws 1838 p. 128, is today a city of some 71,000 people, approximately 61 percent of whom are white and 39 percent are black. It is governed by a Mayor, Mayor Pro Tem and five city commissioners all of whom constitute the board of city commissioners. Until the elections[11] of November 4, 1975, no black citizen of Albany had ever been elected as Mayor, Mayor Pro Tem, or city commissioner. The administrative head of Albany's

4. The record shows and the court finds that the statutory prerequisites as set forth in 42 U.S.C. § 2000e–5 have been complied with and they each have a right to sue the person against whom they each made a charge, The City of Albany.

5. See note 1, *supra.*

6. See note 2, *supra.*

7. The Fifth Circuit Court of Appeals has concluded that the applicable period for employment discrimination cases in courts in Georgia is two years as provided in Ga.Code Ann. § 3–704 which applies to suits "for the recovery of wages, overtime or damages and penalties accruing under laws respecting the payment of wages and overtime . . .." *Franks v. Bowman Transp. Co.,* 495 F.2d 398, 405–06 (5th Cir. 1974), *rev'd in part on other grounds,* —— U.S. ——, 96 S.Ct. 1251, 47 L.Ed.2d 444, 44 U.S.L.W. 4356 (U.S. Mar. 24, 1976), (No. 74–728); *see United States v. Georgia Power Co.,* 474 F.2d 906, 923–24 (5th Cir. 1973). Therefore, the liability of each individual defendant encompasses the period he occupied his office up to two years prior to the filing of the complaint.

8. See note 4, *supra.*

9. 28 U.S.C. § 1331(a) provides: "The district court shall have original jurisdiction of all civil actions wherein the matter in controversy exceeds the sum of value of $10,000, exclusive of interest and costs, and arises under the Constitution, laws, or treaties of the United States."

10. 28 U.S.C. § 1343(3) and (4) provides: "The district courts shall have original jurisdiction of any civil action authorized by law to be commenced by any person:

(3) To redress the deprivation, under color of any State law, statute, ordinance, regulation, custom or usage, of any right, privilege or immunity secured by the Constitution of the United States or by any Act of Congress providing for equal rights of citizens or of all persons within the jurisdiction of the United States;

(4) To recover damages or to secure equitable or other relief under any Act of Congress providing for the protection of civil rights, including the right to vote."

11. The November 4, 1975, elections were ordered by this court on a ward basis. In that election two black candidates were elected as city commissioners, so that today from a racial standpoint Albany has a Mayor, Mayor Pro Tem and three city commissioners who are white and two city commissioners who are black. *Paige v. Gray,* 399 F.Supp. 459 (M.D. Ga.1975).

municipal government is a city manager chosen by by the board of city commissioners and given authority by law to hire and fire all city employees other than those who by law are appointed or elected by the board of city commissioners or are under someone else's jurisdiction, i. e., board of education, library, water, gas and light commission, police department, fire department. He fixes the compensation of those he employs subject to supervision, control or disapproval by the board of city commissioners. Policemen and firemen are appointed by the Board of City Commissioners with suggestions by the police and fire chief permitted. 1923 Ga. Laws p. 370. Under its charter Albany affords a full range of municipal services to its residents.

Albany also operates its own public utility department known as the Water, Gas and Light Commission, obtaining water from its own artesian wells, natural gas from South Georgia Natural Gas Company and electricity from Georgia Power Company and distributing it generally within Albany's city limits. The responsibility for the operation of this department is given by law to said commission consisting of Albany's Mayor and four persons elected by the board of city commissioners for two year terms subject, however, to removal at the pleasure of the board of city commissioners. The "acts and doings of said board of water, gas and light commissioners . . [are] obligatory upon, and . . . considered as if done by the board of city commissioners. . . ." 1923 Ga. Laws p. 400. Since 1959 Ga. Laws p. 2964, the administrative head of the water, gas and light commission has been a general manager elected by the Board of Water, Gas and Light Commissioners. The General Manager hires and fires all employees and supervisors and controls all departments; he fixes all employee salary and compensation except his own, subject to supervision, control or disapproval by the commission. As the defendants contended, the Water, Gas and Light Commission is not a legal entity separate and apart from the City of Albany. In reality it is a department of Albany's city government specified by its charter in much the same manner as Albany's police and fire departments.

The City of Albany receives a substantial portion of its gross revenue from the operations of the water, gas and light commission and uses that revenue along with ad valorem tax, license and other receipts to operate the city and afford municipal services to its citizens. The following figures are

(1) the gross revenues of the city, and

(2) the net profits of the water, gas and light commission paid by that department into the city treasury:

| | | | | |
|---|---|---|---|---|
| 1970-71 | (1) | $ 5,236,058 | (2) | $ 2,062,000 |
| 1971-72 | (1) | 6,192,883 | (2) | 2,329,999 |
| 1972-73 | (1) | 7,640,940 | (2) | 2,702,275 |
| 1973-74 | (1) | 8,932,469 | (2) | 2,724,960 |
| 1974-75 | (1) | 9,472,116 | (2) | 2,980,681 |

The Water, Gas and Light Commission as of July 2, 1968, employed 181 persons—124 whites and 57 blacks. Blacks were employed only in the lowest paying, non-supervisory, janitorial-laboring type of jobs and were paid less than white employees of the same job classification. Employee facilities—rest rooms, drinking fountains, rest areas, coffee pots—were segregated. Promotional opportunities for blacks were non-existent.

The earliest available complete data on the Water, Gas and Light Commission is as of *April 16, 1973,* one year after the strike and eight months after the filing of the lawsuit. On that date the commission employed 226 people—173 whites and 53 blacks. What jobs did the blacks have and what were they paid? As furnished by the defendants, their records show:

> *Gas Department—8 blacks* employed, 2 laborers at $2.03 per hour, 5 equipment operators at $2.15 per hour, and 1 equipment operator at $2.22 per hour. Of *25 whites* employed all but 6 were paid more than the 8 blacks ($2.56—$6.82 per hour)

> *Light Department—3 blacks* employed, 1 equipment maintenance man at $2.22 per hour, and 2 helpers at $2.29 per hour. Of *68 whites* employed, 43 were paid

more than the three black employees ($2.72—$6.82 per hour)

*Water Department—32 blacks* employed, 22 laborers at $2.03 per hour, 8 equipment operator-truck drivers at $2.15 per hour and 2 service foremen at $2.72 per hour. Of *17 whites* employed, five were paid more than the 32 blacks ($2.82 —$6.82 per hour).

*Engineering Department—no blacks* employed. The *10 whites* employed were paid $2.89—$6.82 per hour.

*Administrative Department—*(This department includes the general office in which no blacks were employed before March 1972)—*4 blacks* employed, 1 as Teller, Deposit Clerk and PBX operator at $1.91 per hour, 1 as Posting Clerk and Teller at $1.91 per hour, 1 as Janitor at $1.91 per hour and 1 as Meter Reader at $2.35 per hour. Of *57 whites* employed, 15 were paid more ($2.56—$10.06 per hour).

Until July of 1972 personnel were hired and promoted by departmental supervisors, the tradition being that all promotions came from within each department. A personnel officer position was created in July and he was given the responsibility of interviewing all applicants for employment. Fair employment policies were promulgated. Walls separating bathrooms were torn open, separate drinking fountains were done away with and facilities in general were desegregated.[11a] Hiring and promotion decisions remained in the hands of an all-white management-supervisory team. The result?

On December 31, 1975, the Water, Gas and Light Commission employed 177 persons—142 whites and 35 blacks. The 35 blacks were employed:

*Gas Department—*1 helper at $2.36, 2 equipment operators at $2.60, and 1 meter repair trainee.

*Light Department—*3 helpers at $2.36.

*Water Department—*10 helpers at $2.36, 1 groundskeeper at $2.36, 1 meter repair trainee at $2.60, 1 foreman, hy-

drants and valves at $5.25, and 1 foreman, building and equipment maintenance at $5.57.

*Administrative Department—*2 custodians at $2.36, 2 customer service clerks at $2.60, 2 tellers at $2.60, 1 assistant customer service representative at $2.60, 1 customer records clerk at $2.87, 1 senior programmer at $3.15, and 1 meter reader at $3.47.

For all departments other than the water, gas and light the defendants have furnished detailed employee information for 1968, 1973, and 1976. That information shows:

(a) In 1968 in its other department the city employed 371 persons—252 whites and 119 blacks. The 119 blacks had the following jobs—82 were laborers, 15 were semi-skilled laborers, 9 were skilled laborers, 4 were drivers, 3 were equipment operators I, 1 was a foreman I, and 15 were patrolmen. Of 86 job classifications there were no blacks employed in 79 classifications.

(b) In 1973 in its other departments the city employed 525 persons—392 white and 133 black, an increase since 1968 of 140 whites and 14 blacks. The 133 blacks had the following jobs—72 were laborers, 8 were semi-skilled laborers, 6 were skilled laborers, 8 were drivers, 3 were equipment operators I, 1 was a foreman I, 1 was a key punch operator I, 1 was an assistant zookeeper, 1 was a clerk IV, 4 were a foreman II, 3 were firefighters, 18 were patrolmen, 1 was a dispatcher II, 2 were patrolmen first class, 1 was a route supervisor, 1 was a corporal, and 1 was a detective. Of said 86 job classifications, no blacks were employed in 69.

(c) In 1976 in its other departments the city employed 778 persons—527 whites and 251 blacks, an increase since 1973 of 135 whites and 118 blacks. The 251 blacks had the following jobs—108 were laborers, 14 were semi-skilled laborers, 7 were skilled laborers, 20 were drivers, 4 were a foreman I, 5 were equipment operators I, 3 were custodians, 4 were recreation assistants, 7 were bus

---

**11a.** The desegregation of facilities occurred in late 1974. Record at 348.

drivers, 1 was a watchman, 1 was an assistant agent, 2 were animal control keepers, 1 was a clerk III, 3 were animal control agents, 1 was a bus custodian, 1 was an assistant zookeeper, 2 were a clerk IV, 1 was a greenskeeper, 1 was a key punch operator II, 1 was a pro shop clerk, 1 was a security officer, 5 were equipment operators II, 2 were a foreman II, 13 were firefighters, 13 were patrolmen, 1 was a mechanic II, 4 were plant operators I, 1 was an administrative assistant, 1 was a relocation/social service officer, 1 was a dispatcher II, 2 were fire relief drivers, 7 were patrolmen first class, 1 was a foreman III, 1 was a route supervisor, 4 were corporals, 1 was a recreation supervisor II, 1 was a foreman IV, 1 was a planner I, 1 was an assistant superintendent I, 1 was a sergeant, 1 was a police instructor, and 1 was a captain. Of said 86 job classifications, no blacks were employed in 44 classifications.

Defendant's Exhibit 6 shows as of December 31, 1975, the distribution of other than water, gas and light employees by race and salary rate. In addition to the employees heretofore mentioned, included are 134 library and temporary employees. Note the contents of that exhibit:

CITY OF ALBANY
Distribution of Employees by Race and Salary Rate*
December 31, 1975

| Rate | Whites | | Blacks | | Total | |
|------|--------|--------|--------|--------|--------|--------|
| Per Hour | No. | Accumulated Percentage | No. | Accumulated Percentage | No. | Accumulated Percentage |
| $2.00 - $2.25 | 6 | 0.1 | 7 | 2.3 | 13 | 1.4 |
| $2.26 - $2.50 | 2 | 1.2 | 0 | 2.3 | 2 | 1.6 |
| $2.51 - $2.75 | 26 | 5.5 | 108 | 39.1 | 134 | 16.3 |
| $2.76 - $3.00 | 29 | 10.1 | 58 | 58.8 | 87 | 25.8 |
| $3.01 - $3.25 | 65 | 20.7 | 37 | 71.4 | 102 | 37.0 |
| $3.26 - $3.50 | 96 | 36.2 | 22 | 78.9 | 118 | 50.0 |
| $3.51 - $4.00 | 90 | 50.8 | 17 | 84.6 | 107 | 61.7 |
| $4.01 & over | 304 | 100.8 | 45 | 100.0 | 349 | 100.0 |
| TOTALS | 618 | | 294 | | 912 | |

*Includes:
32 Library
47 Crossing Guards
40 Extra Board
14 Lay Off
 1 Administrative Leave
134 TOTAL

As in the water, gas and light department, hiring and promotion decisions in all other departments are and always have been in the hands of an all-white management-supervising team.

In making hiring and promotion decisions the city's management-supervisory team has utilized various forms and tests. For all departments other than water, gas and light employment applications are taken by the personnel office on a form devised by the personnel officer. That form PX–1 in addition to asking for basic identifying, historical information goes further and asks among other things:

"12. Were you ever dismissed from a school, or was any disciplinary action, including scholastic probation, ever taken against you during your scholastic career? _____
School _____ Date _____
Type of action _____

"18. Do you have any source of income other than your salary? _____ Total amount of such income $_____ What are they?
_____

"19. Has your credit record ever been considered unsatisfactory, or have you ever been refused credit? _____ If so, give date, places, names of creditors and circumstances: _____

"20. Are you indebted to anyone? _____
Name Address Amount
_____

"21. Have you ever been arrested (including traffic violations, but not parking tickets)? _____
List all arrests and holds for investigation.
Date Place Charge Disposition Details
_____

"23. Have you ever been a defendant in a court action? _____ If so, give date, place, court, names of parties involved, nature of action, and final disposition: _____

"27. List all clubs, societies or organizations of which you are or have been a member:
(a) _____ Location _____

* * * * * *

"30. REFERENCES: *Give three references (not relatives or former employers) who are responsible adults of reputable standing in their communities, such as householders, property owners, business or professional men or women, including your family physician, if you have one, who have known you well during the past five years.*

(a) Complete Name _____
No. Years Acquainted _____

Residence Address _____
Business Address _____
Phone Number _____ "

* * * * * *

That form concludes:

"I understand that all appointments are probationary for a period of six (6) months, during which time I must demonstrate my fitness for continued employment. I also understand that any appointment offered me will be contingent upon the results of a complete character and fitness investigation. I am further aware that willfully withholding information or making false statements on this appliation will be a basis for denial of a position prior to employment, and should such willful withholding or false statement become evident after appointment, such evidence will constitute sufficient grounds for dismissal from service with the City of Albany. I fully understand and agree to these conditions. I hereby certify that all statements made by me on this application are true and complete to the best of my knowledge.

"If your application is considered favorable, on what date will you be available for work? _____ 19__.

_____
Signature of Applicant as usually written"

After the application is taken, it is kept for six months during which department heads and supervisors needing new employees use it as their source of prospects to be invited for interview. Department heads and supervisors decide who to interview and who to hire. The police and fire departments also use various tests for hiring and promotion.

The city personnel officer from police training material prepares and administers an entrance, police aptitude exam and corporal/sergeant, lieutenant and captain promotional exams. A passing grade is a condition of employment and promotion. In addition there is a personal interview and evaluation. Samples of these exams have

been introduced and considered by the court. They do not begin to comply with the guidelines for employment tests as promulgated by the Equal Employment Opportunity Commission [12] or with the Supreme Court decisions in *Griggs v. Duke Power Co.*, 401 U.S. 424, 91 S.Ct. 849, 28 L.Ed.2d 158 (1971), and *Albermarle Paper Co. v. Moody*, 422 U.S. 405, 95 S.Ct. 2362, 45 L.Ed.2d 280 (1975), in that each of them does not relate to the requirements of the job. To illustrate, note just one of the 78 questions on the police aptitude exam:

"53. Suppose a newly appointed police officer has red hair. It is most probable that this man will:
1. Have a fiery, uncontrollable temper.
2. Be over aggressive.
3. Be much like the other men on the force.
4. Be very stupid.";

the following questions on the corporal/sergeant exam:

"31. Venereal disease can be *best* stamped out by:
(1) sunbaths and violet ray treatments.
(2) use of prophylactic measures.
(3) regulated vice districts.
(4) education and legal, social, and medical measures.

\* \* \* \* \* \*

"57. A felony has been committed. An alleged offender is arrested and subsequently the charge is brought to the Grand Jury for consideration. The Grand Jury can return an indictment of:
(1) no consideration.
(2) true bill.
(3) no bill.
(4) 2 and 3.";

this question on the lieutenant exam:

"23. The percentage of alcohol in the blood usually taken as the point above which a driver is considered to be definitely under the influence of alcohol is:
(1) .15 percent.
(2) .005 percent.
(3) .01 percent.
(4) .85 percent."

as to which the correct answer is not among the choices, i. e., 1933 Ga.Code Ann. § 68A–902.1 specifies "(3) If there was . . . 0.10 per cent. or more by weight of alcohol in the person's blood, it shall be presumed that the person was under the influence of alcohol;" and these questions on the captain exam:

"4.[13] The word "knowingly" when included in the definition of a crime means with:
(1) malice aforethought.
(2) deliberation and premeditation.
(3) knowledge that the facts exist which constitute the act of omission.
(4) knowledge of the unlawfulness of the act or omission which constitutes a crime.

"35. With regard to mental ability, girls and women habitually guilty of sexual immorality are likely to be:
(1) inferior.
(2) superior.
(3) normal.
(4) distributed along the mental scale in the same manner as the whole population."

The fire department has a training division that prepares entrance aptitude and promotional tests. They are reviewed by the city personnel officer and then are deministered by the training division. These tests likewise do not comply with EEOC guidelines,[14] *Griggs v. Duke Power Co., su-*

---

12. 29 Code of Federal Regulations § 1607.1, *et seq.*

13. Compare the possible answers to the usual definition of knowingly given in criminal trials in United States District Courts: "An act is done 'knowingly' if done voluntarily and intentionally, and not because of mistake or accident or other innocent reason." Devitt and Blackmar, Federal Jury Practice and Instructions § 16.07.

14. See note 12.

*pra,* and *Albermarle Paper Co., supra,* in that they each do not relate to the requirements of the job. To show the basis for this conclusion, attention is directed to the following tests and questions:

A. RECRUIT TEST:

"23. Define the chemical reaction commonly known as combustion.

"24. State the four components of a fire and what will happen if one is removed.

"25. Relate the three physical states of a fuel and what must happen before a change of state can occur.

"26. Compare heat and temperature.

"27. Define ignition temperature.

"28. Define flash point and show its relationship to the lower flammable limits.

"29. How is carbon monoxide (CO) formed and what percent concentration can be deadly to the fire fighter?

"30. What is the toxic effect of carbon monoxide (CO) on the human body?

"31. State the law of heat flow.

"32. State four ways that heat can be transmitted and give definition of each.

"33. Define specific heat and determine how it is compared. State the specific heat of water.

"34. Define a BTU.

"35. What is the latent heat of vaporization of water?

"36. Compare a volume of gas at normal temperature to—
1. an increase in temperature, and
2. a decrease in temperature.

"37. State the three progressive stages of a fire in a closed room and contrast the room temperatures in each stage. What stage requires that ventilation be initiated immediately. State where to ventilate and also method of extinguishment.

"38. What can cause a back draft?

"39. State the GPM formula.

"40. State friction loss formula and to which hose it applies, also what is necessary to convert it to all other hoses.

"41. Find square root of 62.

"42. Find Hypotenuse of a right angle when the height is 60 ft. and the length is 12 ft.

"43. Find the total gallons contained in a 8' x 6' by 3' tank.

"44. When wearing the MSA air mask, in what position is the by pass valve in relation to the wearer?

"45. What sources of water are available to the fire department pumper?

B. RELIEF—DRIVER'S TEST:

"1. The number of gallons of water in a cubic foot of water is most nearly:
(a) 2.31 gals. (b) 6.48 gals. (c) 7.481 gals. (d) 8.35 gals.

"8. Atmospheric pressure at sea level is:
(a) .434 psi (b) 7.481 psi (c) 8.35 psi (d) 14.7 psi

"9. The pressure of a liquid in an open vessel is proportional:
(a) to container's shape (b) to its diameter (c) to container's width (d) to its depth

"10. How many feet will a perfect vacuum elevate a head of water?
(a) 22 feet (b) 25 feet (c) 28 feet (d) 33.9 feet

"24. To exert a pressure of .434 psi on the base of a container, water must be:
(a) a square inch, one foot high
(b) one foot high by one inch
(c) a cubic inch, 2.304 feet high

"25. How many gallons of water will it take to fill a rectangular tank that measures 5 feet by 10 feet by 18 feet?
(a) 6,732.9 gals. (b) 7,615.0 gals. (c) 123,230 gals. (d) 30,510 gals.

"26. How many pounds of water are there in a rectangular tank that measures 5 feet by 15 feet by 20 feet?
(a) 3,365 lbs. (b) 22,250 lbs. (c) 75,000 lbs. (d) 93,750 lbs.

"27. How many gallons of water are there in a tank 12 feet tall with a base of 8 feet if the tank is full? (a) 4,512 gals. (b) 120 lbs. (c) 154 lbs. (d) 188 lbs.

The fire department also has a training program completion of portions of which are prerequisites to promotion. Defendants' Exhibit 29. The training division prepares and administers tests.

Police and Fire Department tests are prepared and administered by supervisory personnel who were not required to pass tests as a condition of employment or promotion.

According to the city personnel officer the city always has an over-abundance of job applicants.

Into what jobs have newly employed blacks and whites been hired by departments other than water, gas and light? Defendants' Exhibit 7 shows:

CITY OF ALBANY, GEORGIA
OCCUPANCY OF INITIAL HIRE POSITIONS—1975, 1973, 1968

| CLASSIFICATION | DEPARTMENT | 1975 B | 1975 W | 1973 B | 1973 W | 1968 B | 1968 W |
|---|---|---|---|---|---|---|---|
| Laborer | Public Works | 108 | 24 | 72 | 20 | 82 | 2 |
| Driver | Public Works | 20 | 18 | 8 | 20 | 4 | 16 |
| Clerk III | Administration | 1 | 8 | 0 | 7 | 0 | 10 |
| Key Punch Operator | Date Processing | 1 | 2 | 1 | 2 | 0 | 0 |
| Clerk IV | Administration | 2 | 21 | 1 | 14 | 0 | 6 |
| Engineer Aide | Engineering | 0 | 5 | 0 | 5 | 0 | 2 |
| Clerk Accountant | Administration | 0 | 3 | 0 | 2 | 0 | 4 |
| Police Patrolman | Police | 13 | 64 | 18 | 42 | 5 | 38 |
| Firefighter | Fire | 13 | 17 | 3 | 25 | 0 | 38 |
| Assistant Inspector | Inspection | 0 | 3 | 0 | 4 | 0 | 1 |
| Programmer | Date Processing | 0 | 1 | 0 | 1 | 0 | 0 |
| Assistant Appraiser | Tax | 0 | 0 | 0 | 0 | 0 | 0 |

Three and three-quarters years after the City of Albany became subject to the Civil Rights Act of 1964 what jobs did blacks and whites have from a line of progression viewpoint? According to the defendants, as of December 31, 1975 the following answer to interrogatory 7 presents the picture:

LABORER

| Class No. | Class Title | Pay Rate Min. | Max. | Blacks | Whites |
|---|---|---|---|---|---|
| 12 | Laborer | 2.52/H | 2.99/H | 68 | 8 |
| 16 | Semi-Skilled Laborer | 2.74/H | 3.26/H | 14 | 3 |
| 21 | Skilled Laborer | 3.06/H | 3.62/H | 7 | 4 |
| | | | | 89 | 15 |

LABOR SUPERVISION

| Class No. | Class Title | Pay Rate Min. | Max. | Blacks | Whites |
|---|---|---|---|---|---|
| 23 | Foreman I | 3.18/H | 3.78/H | 4 | 2 |
| 30 | Foreman II | 3.70/H | 4.39/H | 2 | 3 |
| 34 | Foreman III | 4.03/H | 4.78/H | 1 | 4 |
| 36 | Foreman IV | 4.20/H | 4.99/H | 1 | 6 |
| 38 | Asst. Superintendent | 4.39/H | 5.21/H | 1 | 2 |
| 45 | Superintendent I | 5.09/H | 6.06/H | 0 | 1 |
| 52 | Superintendent II | 5.93/H | 7.05/H | 1 | 1 |
| | | | | 10 | 22 |

## DRIVER/OPERATOR

| Class No. | Class Title | Pay Rate Min. | Max. | Blacks | Whites |
|---|---|---|---|---|---|
| 19 | Driver | 2.93/H | 3.48/H | 8 | 5 |
| 23 | Equipment Operator I | 3.18/H | 3.78/H | 5 | 1 |
| 30 | Equipment Operator II | 3.70/H | 4.39/H | 2 | 11 |
| | | | | 15 | 17 |

## MECHANIC

| Class No. | Class Title | Min. | Max. | Blacks | Whites |
|---|---|---|---|---|---|
| 21 | Mechanic I | 3.06/H | 3.62/H | 0 | 0 |
| 32 | Mechanic II | 3.86/H | 4.58/H | 1 | 4 |
| 34 | Mechanic III | 4.03/H | 4.78/H | 0 | 9 |
| | | | | 1 | 13 |

## ENGINEERING

| Class No. | Class Title | Min. | Max. | Blacks | Whites |
|---|---|---|---|---|---|
| 24 | Engineer Aide | 3.26/H | 3.86/H | 0 | 5 |
| 26 | Engineer Inspector | 3.40/H | 4.03/H | 0 | 2 |
| 38 | Party Chief | 4.39/H | 5.21/H | 0 | 3 |
| | | | | 0 | 10 |

## CLERICAL

| Class No. | Class Title | Min. | Max. | Blacks | Whites |
|---|---|---|---|---|---|
| 19 | Clerk III | 2.93/H | 3.48/H | 1 | 8 |
| 23 | Clerk IV | 3.18/H | 3.78/H | 2 | 21 |
| 27 | Executive Secretary | 3.48/H | 4.12/H | 0 | 4 |
| 36 | Office Manager | 4.20/H | 4.99/H | 0 | 3 |
| | | | | 3 | 36 |

## SANITATION

| Class No. | Class Title | Min. | Max. | Blacks | Whites |
|---|---|---|---|---|---|
| 12 | Laborer | 2.52/H | 2.99/H | 40 | 16 |
| 19 | Driver | 2.93/H | 3.48/H | 12 | 13 |
| 30 | Equipment Operator II | 3.70/H | 4.39/H | 3 | 3 |
| 34 | Route Supervisor | 4.03/H | 4.78/H | 1 | 2 |
| 45 | Asst. Superintendent | 5.09/H | 6.06/H | 0 | 1 |
| | | | | 56 | 35 |

## POLICE

| Class No. | Class Title | Min. | Max. | Blacks | Whites |
|---|---|---|---|---|---|
| 31 | Patrolman | 3.78/H | 4.48/H | 11 | 55 |
| 33 | PFC, Dispatcher, Motorman | 3.95/H | 4.67/H | 9 | 29 |
| 35 | Corporal | 4.12/H | 4.88/H | 4 | 15 |
| 38 | Sergeant/Instructor | 4.39/H | 5.21/H | 2 | 14 |
| 40 | Lieutenant/Detective | 4.58/H | 5.44/H | 0 | 18 |
| 42 | Captain | 4.78/H | 5.68/H | 1 | 2 |
| 45 | Major | 5.09/H | 6.06/H | 0 | 6 |
| 48 | Colonel | 5.44/H | 6.47/H | 0 | 3 |
| 51 | Assistant Chief | 5.81/H | 6.90/H | 0 | 1 |
| | | | | 27 | 143 |

## FIRE

| Class No. | Class Title | Min. | Max. | Blacks | Whites |
|---|---|---|---|---|---|
| 31 | Firefighter | 2.70/H | 3.20/H | 13 | 17 |
| 33 | Relief Driver | 2.82/H | 3.34/H | 2 | 28 |
| 35 | Driver | 2.94/H | 3.49/H | 0 | 33 |
| 40 | Lieutenant/Lineman/Mechanic | 3.27/H | 3.89/H | 0 | 16 |
| 42 | Captain | 3.41/H | 4.05/H | 0 | 27 |
| 44 | Lead Captain | 3.56/H | 4.24/H | 0 | 3 |
| 47 | Batallion Chief | 3.80/H | 4.53/H | 0 | 3 |
| 49 | Assistant Chief | 3.96/H | 4.71/H | 1 | 1 |
| | | | | 15 | 128 |

More whites than blacks have passed the described tests and more whites than blacks have been hired and promoted. At the present time blacks still are not employed in any significant numbers in white collar jobs and are not employed at all in management-supervisory positions.

Promotional opportunities in departments other than water, gas and light are controlled by supervisory personnel who generally promote from within their department. In the Water, Gas and Light department promotional opportunities are now posted on a bulletin board, and all employees are invited to apply to the personnel officer for such positions. In all departments an all-white management-supervisory team still promotes, hires and fires.

### THE APRIL 19, 1972, STRIKE

 Contrary to what the plaintiff black employees were obviously led to believe by the union organizers and contrary to what the union organizers intimated to the Mayor and City Commissioners, public employees in the State of Georgia did not then have nor have they ever had a legal right to strike. *International Longshoremen's Assn., AFL–CIO v. Georgia Ports Authority,* 217 Ga. 712, 124 S.E.2d 733 (1962), *cert. denied* 370 U.S. 922, 82 S.Ct. 1561, 8 L.Ed.2d 503; *Bennett v. Gravelle,* 323 F.Supp. 203 (D.Md.1971), *aff'd* 451 F.2d 1011 (4th Cir. 1971). This is not to say that public employees have any less rights and privileges under the Constitution of the United States than other citizens, for they like all citizens enjoy all of the rights and privileges of our Constitution. Among those rights and privileges is freedom of speech as guaranteed by the First Amendment which includes the freedom to associate for the advancement of beliefs and ideas. *NAACP v. Alabama ex rel. Patterson,* 357 U.S. 449, 78 S.Ct. 1163, 2 L.Ed.2d 1488 (1958). As such public employees cannot be prohibited from participating in the activities of labor unions, *Melton v. City of Atlanta,* 324 F.Supp. 315 (N.D.Ga.1971) (three judge court); *Atkins v. City of Charlotte,* 296 F.Supp. 1068 (W.D.N.C.1969)

(three judge court). Likewise they cannot be penalized for advocating the right of public employees to strike or for joining unions which so contend. *Aurora Ed. Ass'n E. v. Board of Ed., Etc., Kane County, Ill.,* 490 F.2d 431 (7th Cir. 1973); *Joiner v. Thompson,* Civil Action No. 2882, M.D.Ga., Macon Division, Sept. 5, 1973. While they may so associate and advocate and not be retaliated against for doing so, they cannot go further and by concert of action—by striking—compel their public employer to recognize or bargain with a union. 29 U.S. C.A. § 203(d) and (e); *Beauboenf v. Delgado College,* 428 F.2d 470 (5th Cir. 1970); *Firefighters Local 574 v. Floyd,* 225 Ga. 625, 170 S.E.2d 394 (1969). When they do go further and by concert of action—striking—seek to force their public employer to recognize or bargain with a union they have gone beyond the outer limits of their constitutional protections of free expression and association, and they are not constitutionally insulated from being fired or otherwise penalized for refraining and continuing to refrain from working. *E. g., Bullock v. Mumford,* 166 U.S.App.D.C. 51, 509 F.2d 384 (1974); *Bennett v. Gravelle,* 451 F.2d 1011 (4th Cir. 1971), *cert. dismissed,* 407 U.S. 917, 92 S.Ct. 2451, 32 L.Ed.2d 692 (1972); *United Federation of Postal Clerks v. Blount,* 325 F.Supp. 879 (D.D.C.), *aff'd mem.,* 404 U.S. 802, 92 S.Ct. 80, 30 L.Ed.2d 38 (1971); see *Police Officer's Guild v. Washington,* 369 F.Supp. 543 (D.D.C.1973) (three judge court) (dicta); *Melton v. City of Atlanta,* 324 F.Supp. 315 (N.D.Ga.1971) (three judge court) (dicta); *Atkins v. City of Charlotte,* 296 F.Supp. 1068 (W.D.N.C. 1969) (three judge court) (dicta); cf. *UAW v. Wisconsin Empl. Rel. Bd.,* 336 U.S. 245, 69 S.Ct. 516, 93 L.Ed. 651 (1949).

The union organizers evidently also failed to advise the plaintiffs that without danger of losing their jobs, they could file their complaints with EEOC and in this court the same as they did after the strike. They likewise failed to advise the plaintiffs that were they to "take the law in their own hands", they would act at their peril and would most likely be fired.

■ The plaintiffs struck when they had no right to do so. Having done so, their employer had a legal right to terminate their employment. The defendants are therefore not liable for the act of terminating the employment of those of the plaintiffs who were fired for striking.

## DISCRIMINATION

■ Public employment opportunities when afforded by a state or municipal government are rights which must be made available to all on equal terms.[15] This is commanded by the Fourteenth Amendment as adopted in 1868, to wit:

"Section 1. All persons born or naturalized in the United States, and subject to the jurisdiction thereof, are citizens of the United States and of the State wherein they reside. No State shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States; nor shall any State deprive any person of life, liberty, or property; without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws."

by 42 U.S.C. §§ 1981 and 1983, to wit:

"*§ 1981. Equal rights under the law*

All persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts, to sue, be parties, give evidence, and to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens, and shall be subject to like punishment, pains, penalties, taxes, licenses, and exactions of every kind, and to no other.

"*§ 1983. Civil action for deprivation of rights*

Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress."

and since its enactment in 1964 by 42 U.S.C. § 2000e–2(a)—made applicable to cities on March 24, 1972—to wit:

"(a) It shall be an unlawful employment practice for an employer—

(1) to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment because of such individual's race, color, religion, sex, or national origin; or

(2) to limit, segregate, or classify his employees or applicants for employment in any way which would deprive or tend to deprive any individual of employment opportunities or otherwise adversely affect his status as an employee, because of such individual's race, color, religion, sex, or national origin."

all of which "have long evinced a general intent [by Congress] to accord parallel or overlapping remedies against discrimination." *Alexander v. Gardner-Denver Co.,* 415 U.S. 36, 48, 94 S.Ct. 1011, 1019, 39 L.Ed.2d 147, 158 (1974).

■ Title 42 U.S.C. § 2000e of course is the most recent remedy enacted by Congress. In passing this provision which is also referred to as Title VII of the Civil Rights Act of 1964 "Congress did not intend . . . to guarantee a job to every person regardless of qualifications." *Griggs v. Duke Power Co.,* 401 U.S. 424, 430, 91 S.Ct. 849, 853, 28 L.Ed.2d 158, 164 (1971). Instead, "the objective of Congress . . . was to achieve equality of employment opportunities and remove barriers that have operated in the past to favor an identifiable group of white employees over other employees. . . . " *Id.* at 429, 91 S.Ct. at 853, 28 L.Ed.2d at 163.

**15.** Annotations on racial discrimination decisions of the Supreme Court are in 94 L.Ed. 1121, 98 L.Ed. 882, 3 L.Ed.2d 1556, 6 L.Ed.2d 1302, 10 L.Ed.2d 1105, 15 L.Ed.2d 373.

These plaintiffs are proceeding against these defendants pursuant to each of these "parallel or overlapping remedies against discrimination." In doing so it is their burden to prove every essential element of their case by a preponderance of the evidence. Evidence showing or demonstrating that employment practices and procedures have produced a racially discriminatory result is sufficient to establish a *prima facie* [16] case—to carry this burden—for the plaintiffs, *Cooper v. Allen*, 467 F.2d 836 (5th Cir. 1972), *Muller v. U. S. Steel*, 509 F.2d 923 (10th Cir. 1973), and to shift to these defendants the burden of proving that their employment practices and procedures were non-discriminatory. *See Turner v. Fouche*, 396 U.S. 346, 90 S.Ct. 532, 24 L.Ed.2d 567 (1970). While the evidence produced by these plaintiffs is both statistical and actual, statistical evidence alone is sufficient to establish their said *prima facie* case because as recently noted by the Fifth Circuit Court of Appeals "[the] inference [of discrimination] arises from the statistics themselves and no other evidence is required to support the inference." *Sagers v. Yellow Freight System Inc.*, 529 F.2d 721 (April 2, 1976), footnote 16 citing *United States v. Hayes International Corp.*, 456 F.2d 112, 120 (5th Cir. 1972).

The evidence, actual and statistical, is voluminous. In this opinion it has been summarized. Almost all of the evidence came from or was furnished by the defendants and is without dispute. From a consideration of the evidence it is the court's considered judgment that the plaintiffs have produced more than sufficient evidence to establish a *prima facie* case, and that the defendants have produced no evidence that disproves the plaintiffs' *prima facie* showing. From that evidence it is the court's considered judgment that:

(a) In 1968 the City of Albany and its defendant officials employed both white and black persons. Compared to the practices as to white persons, black persons were hired into and then held only the lowest paying, laboring—janitorial, non-supervisory type jobs. Higher paying, more skilled jobs were for whites only. The rate of pay of black employees was less than white persons having comparable tasks to perform. Black persons were not permitted to apply for promotions and were not promoted out of such jobs. All elected and appointed city officials and supervisors were of the white race. Employee facilities—restrooms, drinking fountains, coffee pots, etc.—were segregated by race. Employee functions such as Christmas parties were segregated. From an overall standpoint in every respect white employees and applicants for employment were favored over black employees and applicants for employment.

(b) Between 1968 and early 1973, in spite of Congress amending Title VII to subject the City of Albany to its provisions, the April 19, 1972, strike of black employees and the August 31, 1972, commencement of this lawsuit, the employment patterns and practices of the City of Albany and its defendant officials showed little if any change. Pay differentials between blacks and whites having the same jobs were being or had been corrected. Blacks, however, still were hired into and had only the lowest paying, laborer-janitorial, non-supervisory type jobs. Only whites were considered for and had higher paying, more skilled jobs. All elected and appointed city officials and all supervisory officials were white. Blacks could not apply for, were not considered for and were not promoted into more skilled, better paying jobs. Employment application forms and tests were used not to measure job aptitude but instead to give the false appearance of fairly considering all persons for em-

---

**16.** Black's Law Dictionary, Rev. 4th Ed., defines *prima facie* as follows:

"At first sight; on the first appearance; on the face of it; so far as can be judged from the first disclosure; presumably; a fact presumed to be true unless disproved by some evidence to the contrary. *State ex rel. Herbert v. Whims,* 68 Ohio App. 39, 38 N.E.2d 596, 599."

ployment and promotion and to perpetuate the past but continuing discriminatory practices. Promotions were made from within departments thus perpetuating the conditions of the past. Employment facilities were still segregated. Since these were the employment patterns and practices in 1973, the same patterns and practices had existed (i) on and after March 24, 1972, when the City of Albany became subject to 42 U.S.C. § 2000e, (ii) on April 24, 1972, when charges of employment discrimination were filed with EEOC in behalf of five of the named plaintiffs and (iii) on August 31, 1972, when the plaintiffs filed their complaint in this court.

(c) As of the end of 1975 the City of Albany and its defendant officials have altered their employment patterns and practices in some respects. Compared to 1973 the Water, Gas and Light department employed 18 fewer blacks. Of the 35 blacks then employed, two had been promoted to foreman and six had been added to the administrative department which before 1972 was a white only department. Blacks however had not progressed to higher paying jobs except for two foremen who were earning $5.25 and $5.57 per hour. Employee facilities had been desegregated and segregated employee gatherings were eliminated. The management-supervisory team, however, remained all white and the basic pattern of favoring whites over blacks continued. In other departments blacks were hired or promoted into 25 classifications in which they had not been employed. Some blacks—45—were being paid higher wages—over $4.00—but whites still dominated jobs paying higher wages. Three hundred four (304) whites were paid over $4.00 per hour. Application forms and tests were being used. Hiring and promotional decisions were still being made by an all-white management-supervisory team. As the initial hire chart shows most blacks—108 of 158—were still hired as laborers, and as the line of progression chart shows, blacks are still with few exceptions kept in lower-paying, blue-collar, non-supervisory jobs. While the pattern and practice of discriminating against blacks has lessened, it nevertheless continues to the present day.

The plaintiffs are therefore entitled to a judgment of liability (1) as to and against the City of Albany under 42 U.S.C. § 2000e for the period of time commencing March 24, 1972, and except as to those plaintiffs who were lawfully discharged on April 19, 1972, continuing to the present time, (2) as to and against the individual named defendants under 42 U.S.C. §§ 1981 and 1983 for the period of time commencing August 31, 1970, and except as to those plaintiffs who were lawfully discharged on April 19, 1972, continuing to the expiration of their term of office or the present time, whichever is later.

The patterns and practices having continued and being likely to continue into the future, the plaintiffs are entitled to a permanent injunction against the City of Albany and the defendant officials including their successors in office, if any. The plaintiffs within fifteen (15) days are directed to prepare and submit a suggested form of injunctive order to the court. The defendants are directed within ten (10) days after receipt of a copy to submit their comments and criticisms.

Plaintiffs in their complaint and through their lawyers ask for monetary awards and other relief all of which will be considered by the court at an evidentiary hearing to be held on Tuesday, June 15, 1976, at 9:30 a. m., in the United States Courtroom, Post Office and Courthouse Building, Americus, Georgia.

SO ORDERED, this the 6th day of May, 1976.