**In re BIRMINGHAM REVERSE DIS-CRIMINATION EMPLOYMENT LITIGATION.**

No. 86–7108.

United States Court of Appeals,
Eleventh Circuit.

Dec. 15, 1987.
Rehearing and Rehearing En Banc
Denied Jan. 25, 1988.

Raymond P. Fitzpatrick, Jr., Fitzpatrick & Jordan, Birmingham, Ala., for Click, et al.

Mary E. Mann, Sp. Litigation Counsel, U.S. Dept. of Justice, Civ. Rights Div., James S. Angus, Senior Trial Atty., William B. Reynolds, David Kevin Flynn, Michael A. Carvin, Dennis J. Dimsey, Washington, D.C., Frank W. Donaldson, U.S. Atty., Birmingham, Ala., for U.S.

James P. Alexander, George Hawley, Robert K. Spotswood, Eldridge D. Lacy, Richard H. Walston, Birmingham, Ala., for City of Birmingham & Arrington, appellee/cross appellant.

Robert D. Joffe, Cravath, Swaine & Moore, New York City (co-counsel), Stephen Spitz, Lawyers Committee for Civ. Rights Under Law, William L. Robinson, Richard T. Seymour, Washington, D.C., for Martin, et al., appellees/cross appellants.

Judson E. Tomlin, Jr., Haskell, Slaughter, Young & Lewis, Charles A. McCallum, III, Thomas Drake Samford, IV, Mark Ezell, A. Lee Martin, Jr., Frank M. Young, III, Birmingham, Ala., for The Personnel Bd. of Jefferson County, appellees.

Before TJOFLAT and ANDERSON, Circuit Judges, and HENDERSON, Senior Circuit Judge.

TJOFLAT, Circuit Judge:

## I.

This litigation has its origin in three employment discrimination actions filed in 1974 and 1975 against the City of Birmingham (the City), the Jefferson County, Alabama Personnel Board (the Board),[1] and various other defendants.[2] In January 1974, the Ensley Branch of the NAACP and seven black individuals filed separate class action complaints in the district court alleging that the City and the Board had violated, among other things, Title VII of the Civil Rights Act through racially discriminatory hiring and promotion practices.[3] In May 1975, the United States brought suit against the same defendants, also alleging a pattern or practice of discrimination in several areas of public service employment.

The district court consolidated the three cases. In December 1976, it held a bench trial on the limited issue of the validity of entry-level tests the City and the Board used to screen applicants for firefighting and police officer positions. The district court concluded that the tests were discriminatory in violation of Title VII.[4] In January 1977, the district court entered a final judgment on this limited issue, and the defendants appealed. This court affirmed the district court's determination of liabili-

ty. *Ensley Branch of NAACP v. Seibels,* 616 F.2d 812 (5th Cir.), *cert. denied,* 449 U.S. 1061, 101 S.Ct. 783, 66 L.Ed.2d 603 (1980).

The district court held a second trial in August 1979 on the issue of the validity of other testing and screening devices the Board employed. The plaintiffs' independent claims against the City, however, were not tried.

While awaiting the district court's decision in connection with the August 1979 trial, the parties entered into settlement negotiations which resulted in two proposed consent decrees: one between the City and the black plaintiffs, the Ensley Branch of the NAACP, and the United States (the City decree), and one between the Board and the black plaintiffs, the Ensley Branch of the NAACP, and the United States (the Board decree). The consent decrees set forth an extensive remedial scheme, including long-term and interim annual goals for the hiring of blacks as firefighters and the promotion of blacks to the position of fire lieutenant.[5] Each decree specifically provided that it did not constitute an adjudication or admission of liability by the Board or the City.

After entering an order provisionally approving the decrees, the district court conducted a fairness hearing to consider the objections of interested parties. At that

1. The Board is an independent public agency that administers the civil service system in Jefferson County. One of its functions is to recruit, screen, and test applicants for classified City employee positions. Employees holding classified positions include all full-time City employees except common laborers, judicial officers, elected officials, and certain executives. When a classified position opens, the Board certifies to the City a list of three eligible applicants, from which the City makes its choice.

2. The complaints also named as defendants the mayor of Birmingham and several officials associated with the Board. Unless otherwise indicated, we shall throughout this opinion refer to these parties collectively as "the City and the Board."

3. The plaintiffs alleged violations of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e to 2000e–17 (1982); 42 U.S.C. § 1981 (1982); and 42 U.S.C. § 1983 (1982).

4. As a remedial measure, the court ordered the Board to certify a certain number of black applicants for employment.

5. Under the proposed City decree, which the district court ultimately approved, the City was to be enjoined permanently from engaging in discriminatory employment practices. The decree required the City to adopt as a long-term goal the employment of women and blacks in each City job classification "in percentages which approximate their respective percentages in the civilian labor force of Jefferson County." The decree set forth specific interim annual goals for the hiring of blacks in specified job classifications, including a 50% annual goal for firefighter, a 50% annual goal for fire lieutenant, and a 25% annual goal for engineering department positions. The proposed Board decree, which the district court ultimately approved as well, required the Board to certify blacks in numbers sufficient to meet the goals set forth in the City decree.

hearing, the Birmingham Firefighters Association 117 (BFA)[6] filed objections as amicus curiae. After the fairness hearing but before final approval of the consent decrees, the BFA and two of its members moved, pursuant to Fed.R.Civ.P. 24(a), to intervene as of right in each of the three cases, contending that the proposed consent decrees would adversely affect their rights. The court denied the motions as untimely, and, on August 18, 1981, entered an order approving the fairness of the two decrees. Although noting that the only judicial finding of discrimination to that point had been with respect to the entry-level screening tests, the court stated that "it can hardly be doubted that there is more than ample reason for [the Board and the City] to be concerned that they would be in time held liable for discrimination against blacks at higher level positions in the police and fire departments."[7] The court concluded that "[w]hether or not the proposed decree would in each instance correspond to some finding of discrimination which this court might make ... is not the question. The settlement represents a fair, adequate and reasonable compromise of the issues between the parties to which it is addressed and is not inequitable, unconstitutional, or otherwise against public policy." The court retained jurisdiction to enforce the decrees.

After the district court denied the motion to intervene and approved the decrees, seven white male firefighters brought suit in the district court against the City and the Board. They asked the court to enjoin the enforcement of the two consent decrees on the ground that the decrees would operate to discriminate against them in violation of Title VII. The plaintiffs applied for a preliminary injunction, but the court denied it.

The court's orders denying the motion to intervene and the preliminary injunction were appealed, and the appeals were consolidated. This court dismissed the appeal of the order denying the motion to intervene, concluding that the district judge had not abused his discretion. We pointed out that the white firefighters would not be prejudiced by the denial of intervention because they could file a separate Title VII action on their own behalf. We also affirmed the order denying preliminary injunctive relief, concluding that the individual firefighters had not carried the burden of showing irreparable harm. *United States v. Jefferson County*, 720 F.2d 1511 (11th Cir.1983).

After having been denied preliminary injunctive relief, the seven white firefighters brought suit in the district court against the City and the Board. They alleged that they were being denied promotions in favor of certain black firefighters whom they asserted were less qualified, and asked the court to enjoin the City from making those promotions. Maintaining that "[t]he defendants are certifying candidates and making promotions on the basis of race under the assumed protection of the consent settlements," the seven white firefighters alleged that the City and the Board were engaged in a practice or pattern of discrimination and were intentionally favoring blacks over whites in violation of Title VII and the equal protection clause of the fourteenth amendment.[8]

Several other City employees who had been denied promotions subsequently brought similar suits in the district court

---

6. The BFA is a labor association of City firefighters. It represents a majority of the firefighters and negotiates with the City on their behalf.

7. The district court recited the following statistics for the police and fire departments as of July 21, 1981: "79 of the 480 police officers are black, 3 of the 131 police sergeants are black, and none of the 40 police lieutenants and captains are black. In the fire department, 42 of the 453 firefighters are black, and none of the 140 lieutenants, captains, and battalion chiefs

are black." The parties to the present litigation stipulated that in 1980 the civilian labor force of the City of Birmingham was approximately 49.9% black and 50.1% white.

8. The complaint also alleged violations of the Omnibus Crime Control and Safe Streets Act of 1968, the State and Local Fiscal Assistance Act of 1972, and the fifth amendment of the United States Constitution. The plaintiffs did not pursue these claims at trial and, accordingly, they are not involved in this appeal.

against the City and the Board.[9] In addition, the United States, notwithstanding its status as a signatory of the consent decrees, brought suit against the City and the Board,[10] lodging essentially the same allegations as the various individual plaintiffs.[11]

In its answers to the complaints in these cases, the Board admitted that it had made "race conscious certifications pursuant to [the] Consent Decree, as is required by the Consent Decree." The City likewise admitted that it had made "numerous race conscious promotion and employment decisions pursuant to [the City decree's] terms." Both the City and the Board, however, denied that they had violated Title VII or the equal protection clause. Both contended that the plaintiffs were bound by the consent decrees and that the promotions were therefore lawful as a matter of law because they had been made pursuant to those decrees.

Seven black individuals moved both in their individual capacities and as class representatives to intervene as parties defendant in the several suits.[12] The movants sought, pursuant to Fed.R.Civ.P. 23, to represent the class of black applicants and employees that had negotiated and signed the consent decrees in 1981. Because the relief requested by the plaintiffs, if granted, would foreclose future promotions of blacks under the decrees, and perhaps result in the demotion of blacks already promoted, the movants urged that they were entitled to intervene as of right under Fed. R.Civ.P. 24(a). The district court denied the motion to intervene under Rule 24(a), but granted it under Rule 24(b) (permissive intervention).[13] The court also ruled that the movants could intervene only in their individual capacities.[14]

In April 1984 the district court consolidated the several suits for all purposes under the caption "In re Birmingham Reverse Discrimination Employment Litigation." After the parties joined issue, they engaged in extensive discovery concerning the criteria the City used when making the challenged promotions. The court then held a series of pretrial conferences in an effort to settle issues for trial. At those conferences, the plaintiffs[15] made repeated requests for guidance as to what they would have to prove to make out a case of unlawful discrimination.

Without expressly so stating, the district judge treated the plaintiffs as if they were bound by the consent decrees and as if they were alleging solely that the City had violated the City decree. Specifically, the district judge treated the plaintiffs as if they were contending that the City had violated paragraph 2 of the City decree, which provides as follows:

---

**9.** Suits were filed by City engineering department employees as well as fire department employees. Members of both departments are among the parties to this appeal.

**10.** The United States, as a signatory of the consent decrees, was originally named as a defendant in two of the reverse discrimination suits. It then moved the district court to intervene as party plaintiff in the remaining cases. The court granted the motion, and also granted the United States' motion to realign itself as plaintiff in the two suits in which it had been named as defendant.

**11.** The United States' complaint, however, contained no mention of the consent decrees.

**12.** These were the same individuals who had filed a class action against the City and the Board in 1974. At that time, they alleged that they had been denied employment or promotion due to discriminatory employment practices by the City and the Board.

**13.** In light of our discussion in Part II of this opinion, these individuals were entitled to intervene as of right because they represented the interests of persons whose jobs were directly at stake given the relief sought by the plaintiffs.

**14.** The court held that "[n]either Rule 23 nor Rule 24 contemplates that a class determined to exist in one case can intervene, as such class, in another case.... If [the movants] wish the adjudication in this case to be binding upon a class, they must seek class certification as a defendant class under the procedures and requirements of Rule 23." The defendant-intervenors have not challenged this ruling.

**15.** We use "plaintiffs" to refer to both the United States as plaintiff intervenor and the individuals who filed the reverse discrimination suits. When we refer to the latter group alone, we shall use "individual plaintiffs."

Nothing herein shall be interpreted as requiring the City to hire unnecessary personnel, or to hire, transfer, or promote a person who is not qualified, or to hire, transfer, or promote a less qualified person, in preference to a person who is demonstrably better qualified based upon the results of a job related selection procedure.

By narrowing its attention to paragraph 2, the district court effectively transformed the plaintiffs' position from that of asserting unlawful discrimination under Title VII and the equal protection clause to that of requesting the court to enforce a specific provision of the City decree.[16] Given this characterization of the case, the plaintiffs' claims against the Board became irrelevant.[17]

At trial, the parties focused on the extent to which the City had complied with paragraph 2. The plaintiffs' case consisted of three elements: (1) whether the individual plaintiffs were "demonstrably better qualified" within the meaning of paragraph 2, (2) whether the criteria that plaintiffs proposed for comparing qualifications were based on "job related selection procedures" within the meaning of paragraph 2, and (3) whether the City had in fact been aware of those criteria when it made the challenged promotions.[18]

At the conclusion of plaintiff's case, the court granted the Board's motion to dismiss. After further proceedings, the court entered an order in favor of the City and the defendant intervenors. The court held that the plaintiffs—both the United States and the individual plaintiffs—were bound by the consent decrees. It further held that the plaintiffs had failed in their effort to show a violation of paragraph 2 of the City decree. In fact, the court expressly found that the City *"does not use* a job-related selection procedure in evaluating the qualifications of certified candidates [and] has made no effort to develop ... such a procedure." (Emphasis added.) Thus, the court in effect held that the City had unilaterally foreclosed the plaintiffs from establishing a violation of paragraph 2: since the City did not use a job-related selection procedure, the court apparently reasoned, paragraph 2 imposed no obligations on it. Having thus disposed of the issue whether the City had violated paragraph 2, the court did not decide the plaintiffs' Title VII and equal protection claims.

Following entry of partial final judgment for the defendants pursuant to Fed.R. Civ.P. 54(b),[19] several of the individual plaintiffs appealed, as did the United States. Because the district court erred in holding that the individual plaintiffs were bound by the consent decrees, we reverse and remand with instructions that the district court try their claims of unlawful discrimination. We affirm the district court's dismissal of the United States' claims.

## II.

With respect to the individual plaintiffs, the issue on appeal is whether they are precluded by the consent decrees from bringing an independent Title VII suit

---

16. In effect, the court treated the plaintiffs as if they were parties to the City decree seeking an order to show cause why the City should not be held in civil contempt for violating the terms of the decree.

17. The Board, therefore, is only a nominal party to this appeal.

18. While the first two elements were derived directly from the language of paragraph 2, the third element was implied by the district judge. The judge had informed plaintiffs' counsel at pretrial conference that "you ... better be prepared to deal with the demonstrably better qualified issue and establish that blacks were promoted when there were demonstrably better qualified whites there on the list that the deci-

sion makers knew to be demonstrably better qualified."

19. The order of partial final judgment provided that it did not affect the counterclaims pending against the United States. These counterclaims, lodged by the City and the defendant-intervenors, alleged that the United States had failed to fulfill its obligation as a signatory of the consent decrees to "defend the lawfulness of ... remedial measures [under the decrees] in the event of challenge by any other party." The City and the defendant-intervenors requested the court to dismiss the United States' complaint in intervention and enter an order in the earlier cases directing the United States to comply with its obligation to defend the consent decrees.

against the City and the Board asserting that actions taken pursuant to those decrees have resulted in unlawful discrimination against them. Because we conclude that these plaintiffs were neither parties nor privies to the consent decrees, we hold that their independent claims of unlawful discrimination are not precluded.

■ As the district court recognized, the parties to a consent decree cannot attack the decree after it has been entered. With respect to the preclusive effect of a consent decree on nonparties, however, the same principles of res judicata and collateral estoppel that govern ordinary judgments come into play. *United States v. Jefferson County*, 720 F.2d 1511, 1517 (11th Cir. 1983). An examination of those principles is thus essential to our analysis.

It is a fundamental premise of preclusion law that "[a] nonparty to a prior decision cannot be bound by it unless he had sufficient identity of interest with a party that his interests are deemed to have been litigated." *Wilson v. Attaway*, 757 F.2d 1227, 1237 (11th Cir.1985). As the Supreme Court has emphasized, this premise is required by due process: "[i]t is a violation of due process for a judgment to be binding on a litigant who was not a party or a privy and therefore has never had an opportunity to be heard." *Parklane Hosiery Co. v. Shore*, 439 U.S. 322, 327 n. 7, 99 S.Ct. 645, 649 n. 7, 58 L.Ed.2d 552 (1979).

Some courts, however, have seen fit not to apply this aspect of preclusion law to consent decrees in Title VII cases. *See, e.g., Thaggard v. City of Jackson*, 687 F.2d 66 (5th Cir.1982), *cert. denied*, 464 U.S. 900, 104 S.Ct. 255, 78 L.Ed.2d 241 (1983); *Dennison v. City of Los Angeles*, 658 F.2d 694 (9th Cir.1981); *EEOC v. McCall Printing Corp.*, 633 F.2d 1232 (6th Cir.1980). Instead, these courts have decided to clothe consent decrees with the doctrine of "impermissible collateral attack," thereby immunizing parties to a consent decree from charges of discrimination by nonparties, provided the allegedly discriminatory acts were taken pursuant to the consent decree. Courts taking this approach have empha-

sized the need to encourage voluntary agreements intended to eradicate race discrimination, and have reasoned that to permit third party attacks would discourage parties from negotiating such agreements.

■ Although we also recognize the strong public policy in favor of voluntary affirmative action plans, we have rejected the "impermissible collateral attack" doctrine "to the extent that it deprives a nonparty to the decree of his day in court to assert the violation of his civil rights." *Jefferson County*, 720 F.2d at 1518. A contrary rule would amount to an exception to the res judicata and collateral estoppel law that we presently apply. *Id.* It would also contravene the strong public policy of including all interested parties in settlement negotiations in order to avoid subsequent suits and dissatisfaction caused by exclusion. In light of the due process underpinnings of preclusion law, and in light of public policy considerations, we are unwilling to recognize such an exception. Thus, even if a consent decree purports to affect the rights of third parties, those parties are not bound by the terms of the decree unless their interests were adequately represented by a party to the decree. *See Local No. 93 v. City of Cleveland*, — U.S. —, 106 S.Ct. 3063, 3079, 92 L.Ed.2d 405 (1986) ("A court's approval of a consent decree between some of the parties ... cannot dispose of the valid claims of nonconsenting [parties]; if properly raised, these claims remain and may be litigated by the [nonconsenting parties]."). The policy of encouraging voluntary affirmative action plans must yield to the policy against requiring third parties to submit to bargains in which their interests were either ignored or sacrificed. *See Firefighters Local Union No. 1784 v. Stotts*, 467 U.S. 561, 589 n. 4, 104 S.Ct. 2576, 2593 n. 4, 81 L.Ed.2d 483 (1984) (O'Connor, J., concurring) ("The policy favoring voluntary settlement does not, of course, countenance unlawful discrimination against existing employees.").

The individual plaintiffs were parties to neither the City decree nor the Board decree. Indeed, their Title VII claims did not accrue until after the decrees became effec-

tive and the challenged promotions were made; that is, their claims did not accrue until they were denied promotions.

■■■ Nor did the individual plaintiffs have an identity of interest with a party to the consent decrees such that they should be treated as parties for preclusion purposes. The BFA, an organization to which the plaintiffs in the fire department belong, did attempt with two of its members[20] to intervene in the original suits, but the court denied intervention as untimely.[21] The BFA also filed objections as amicus curiae at the fairness hearing the district court held before approving the decrees. That participation, however, hardly made the BFA a party to the consent decrees. As we have indicated above, a consent decree by definition binds only those who explicitly or implicitly consent to it. *See Jefferson County,* 720 F.2d at 1518 n. 19.

■ Of course, the City did consent to the decrees, and one might argue that the individual plaintiffs as City employees shared an identity of interest with the City such that they are now bound. However, the record fails to indicate that the City mounted a vigorous defense to the allegations leveled against it before entering into settlement negotiations. Indeed, the district court never tried the independent claims against the City. Consequently, it is far from clear that the City in any way adequately represented the individual plaintiffs' interests in the events leading up to the entry of the decrees. Moreover, it is not clear that the plaintiffs and the City shared any identity of interest at all. The City's various interests in this dispute conceivably may have conflicted in part with the plaintiffs' single interest in preserving preexisting promotion opportunities. In-

deed, the City's interests were antagonistic in that it had every reason to avoid a determination of liability and little reason to object to the promotion aspect of the settlement. The settlement did not require the City to make any additional promotions, but only to reallocate the promotions that it would have made in any event. In real terms, the relief contemplated by the decrees was to come not from the hands of the City, but from the hands of the employees who would have otherwise received the promotions. At the very least, the City was in the position of a disinterested stakeholder with respect to the contested promotions. Given the disparate interests of the City and the individual plaintiffs, it is clear that the City could not have served as an effective surrogate for the individual plaintiffs' interests when it negotiated the plan incorporated into the consent decrees. Accordingly, it would be impossible to conclude that these plaintiffs are in any way bound by those decrees.

■ As we have stated before, "[t]he judge must be cautious in approving consent decrees only to the extent that he should be aware the decree is more likely to be of little effect the fewer parties there are in the suit to be bound." *Jefferson County,* 720 F.2d at 1518 n. 19; *see City of Cleveland,* — U.S. ——, 106 S.Ct. at 3079 ("Of course, parties who choose to resolve litigation through settlement may not dispose of the claims of a third party, and *a fortiori* may not impose duties or obligations on a third party, without that party's agreement."). Thus, to avoid claims such as those that have arisen in the present case, it is incumbent upon the district judge to ensure before entering a con-

---

**20.** The two BFA members who unsuccessfully sought to intervene in the original employment discrimination suits are not named as plaintiffs in any of the reverse discrimination suits. The individual reverse discrimination plaintiffs who are firefighters belong to the BFA. Their counsel, Mr. Fitzpatrick, represented the BFA when it filed objections as amicus curiae at the fairness hearing.

**21.** At first blush, it may appear anomalous that we now hold that the individual plaintiffs are not bound by the decrees while we earlier af-

firmed the district court's denial of the BFA members' motion to intervene in the cases from which the decrees arose. As our opinions here and in *Jefferson County* demonstrate, however, the issues of intervention and preclusion involve entirely different analyses. Indeed, as we took pains to point out in *Jefferson County,* the denial of the motion to intervene was not prejudicial to the movants partly because they were not precluded from instituting an independent Title VII suit. *Jefferson County,* 720 F.2d at 1518.

sent decree that the interests of all real parties in interest have been adequately represented. *See Stotts*, 467 U.S. at 588 n. 3, 104 S.Ct. at 2593 n. 3 (O'Connor, J., concurring) ("[I]f innocent employees are to be required to make any sacrifices in the final consent decree, they must be represented and have had full participation rights in the negotiation process."). If the plan affects promotion practice so as to alter or abolish the promotion opportunities of existing employees, those employees must be represented as parties to the decree if they are to be bound by it.

### III.

■ Having concluded that the individual plaintiffs are not bound by the consent decrees, we remand with instructions that the district court try the plaintiffs' claims of unlawful discrimination. Because the defendants concede that the challenged promotions were made in a race conscious manner, and because the defendants seek to use the consent decrees to justify their actions, we feel compelled to provide the district court with some guidance as to the legal significance of a consent decree in Title VII litigation when, as in this case, an employer seeks to interpose it as a defense against employees who were neither parties nor privies to it.

The Supreme Court's interpretation of Title VII's application in reverse discrimination suits was recently articulated in *Johnson v. Transportation Agency*, — U.S. —, 107 S.Ct. 1442, 94 L.Ed.2d 615 (1987). In *Johnson*, the Court upheld against Title VII attack a county's promotion of a woman over a marginally better qualified man pursuant to a voluntary affirmative action plan. Under the plan, which set as a long-range goal the creation of a workforce in which women and minorities were proportionately represented according to their representation in the area labor market, the county authorized its officials to consider, among other factors, race and gender when making promotion decisions. Following the promotion of a woman pursuant to the plan, a male employee who had been passed over filed a Title VII suit.

Guided by its decision in *United Steelworkers v. Weber*, 443 U.S. 193, 99 S.Ct. 2721, 61 L.Ed.2d 480 (1979), the Court set forth a two-part inquiry to be used when a Title VII defendant seeks to use a voluntary affirmative action plan to justify a race or gender conscious employment decision. First, consideration of the race or gender of promotion candidates must be "justified by the existence of a 'manifest imbalance' that reflected underrepresentation of women [or minorities] in 'traditionally segregated job categories.'" *Id.*, — U.S. at —, 107 S.Ct. at 1452 (quoting *Weber*, 443 U.S. at 197, 99 S.Ct. at 2724 (1979)). The manifest imbalance "need not be such that it would support a prima facie case [of discrimination] against the employer." *Id.* With respect to the specific facts before it, the *Johnson* Court concluded that women had been "egregiously underrepresented" in the relevant job categories, noting that "none of the 238 positions was occupied by a woman." *Id.* at —, 107 S.Ct. at 1454.

Second, to withstand Title VII scrutiny, the voluntary affirmative action plan must not "unnecessarily trammel[ ]" the rights of nonminority employees or "create[ ] an absolute bar to their advancement." *Id.* at —, 107 S.Ct. at 1455. In holding that the plan before it was tailored narrowly enough to meet this second requirement, the Court emphasized that "the Plan merely authorizes that consideration be given to affirmative action concerns when evaluating qualified applicants." *Id.* The Court concluded that "[t]he Plan thus resembles the 'Harvard Plan' approvingly noted by Justice POWELL in *University of California Regents v. Bakke*, 438 U.S. 265, 316–319, 98 S.Ct. 2733, 2761–63, 57 L.Ed.2d 750 (1978), which considers race along with other criteria in determining admission to the college." *Id.* The Court also noted that the petitioner remained eligible for other promotions when they came open.

On remand, we direct the district court to evaluate the defendants' justification for the challenged promotions under the stan-

dards articulated in *Johnson.* In an analytical sense, this case differs from *Johnson* only to the extent that defendants point to a consent decree, rather than a voluntary affirmative action plan, to justify their race conscious promotion decisions. We perceive no reason for treating a consent decree entered pursuant to a voluntary settlement [22] differently from a voluntary affirmative action plan. In both instances, the employer has embarked on a voluntary undertaking; we reject any notion that the memorialization of that voluntary undertaking in the form of a consent decree somehow provides the employer with extra protection against charges of illegal discrimination. A contrary conclusion would fly in the face of our earlier observations about the preclusive effect of such decrees.[23]

The reasons for according a consent decree no more weight than a voluntary affirmative action plan when the consent decree is offered as justification for a race conscious employment decision are especially strong where, as here, vitally interested parties are not parties to the plan incorporated into the decree. The City decree does contain a provision—paragraph 2—that facially serves to protect the interests of nonminority employees. In light of the district court's interpretation of paragraph 2, however, that protection is illusory at best. The district court's interpretation of the City decree permits the City to make race conscious promotions without using *any* job-related selection procedure. Given the natural potential that such an arrangement will trammel the interests of nonminority employees, we are compelled to the conclusion that the district court should subject the consent decrees to

heightened scrutiny under the second prong of the *Johnson* analysis when it tries the individual plaintiffs' claims.

## IV.

■ Our disposition of the United States' appeal involves a separate analysis. As the district court correctly observed, the United States is estopped from collaterally attacking the consent decrees because it is a party to them. Moreover, we hold that the United States, as a party to the decrees, may not pursue its claims as plaintiff intervenors in the present cases. The court that entered the consent decrees retains jurisdiction over the cases out of which the decrees arose, and the United States' remedy, if it believes that the City has violated the terms of the decrees, is to seek an order to show cause why the City should not be held in civil contempt. *See Newman v. State,* 683 F.2d 1312, 1318 (11th Cir. 1982), *cert. denied,* 460 U.S. 1083, 103 S.Ct. 1773, 76 L.Ed.2d 346 (1983). Likewise, if the United States believes that the decrees should be modified based on changed circumstances, its remedy as a party to the decrees is to seek modification in the court which retained jurisdiction over the cases in which the decrees arose. *Id.* at 1318 n. 15. Accordingly, the United States' status in the present litigation is in effect merely that of an amicus curiae.

## V.

To summarize, the district court correctly dismissed the United States' claims. The district court erred, however, in holding that the individual plaintiffs were bound by the consent decrees. According-

---

**22.** It should be emphasized that there has been no judicial determination that the City is liable for past discrimination with respect to its promotion practices. The only finding of discrimination related to the adverse impact of entry-level screening examinations. *See supra* note 4 and accompanying text. Thus, with respect to the promotion practices upon which plaintiffs base their claims, we are not presented with a case in which the defendant was required by law to implement an affirmative action program designed to remedy the effects of past discrimination.

**23.** Likewise, the consent decree in this case must be considered equivalent to a voluntary affirmative action plan for purposes of equal protection analysis. The Supreme Court addressed the equal protection obligations of an employer who has instituted a voluntary affirmative action plan in *Wygant v. Jackson Bd. of Educ.,* 476 U.S. 267, 106 S.Ct. 1842, 90 L.Ed.2d 260 (1986).

ly, it must on remand try those plaintiffs' claims of illegal discrimination.

AFFIRMED in part, REVERSED in part and REMANDED.

ANDERSON, Circuit Judge, dissenting:

Respectfully, I dissent. In my judgment, the opinion for the court ignores an important holding in *United States v. Jefferson County*, 720 F.2d 1511 (11th Cir.1983). In *Jefferson County*, the BFA and two white firefighters, who are probably in privity with the individual plaintiffs in the instant case, sought to intervene in the litigation which resulted in the consent decree at issue in this case. This court affirmed the district court's denial of intervention, holding that those intervenors "knew at an early stage in the proceedings that their rights could be adversely affected, as was evidenced by their conversations with the City regarding the tactics the City should take in defending the action," *id.* at 1516. In analyzing the prejudice prong of the intervention question, this court addressed the preclusive effect of the consent decree on the intervenors and held:

> Naturally, that the employer undertook the challenged action pursuant to a court-approved consent decree ... would be evidence of nondiscriminatory intent by the employer.

*Id.* at 1518. I dissent because the opinion for the court in this case ignores the holding just quoted from the previous litigation in *Jefferson County*. In determining whether the City has discriminated against the instant plaintiffs, *Jefferson County* requires that the trial judge consider as evidence of nondiscriminatory intent[1] the fact that the City's action was taken pursuant to the consent decree. Ignoring this man-

date from *Jefferson County*, the opinion for the court instructs the district judge on remand merely to evaluate the validity of the consent decree.

In my judgment, the appropriate resolution of this case would distinguish between the individual plaintiffs' claim for back pay and their claim for prospective relief. With respect to their back pay claim, they will have to establish that the City intentionally discriminated against them, and their attempt will probably be defeated under the *Jefferson County* rationale by the evidence that the City was merely implementing the consent decree. This result is consistent with the demands of equity. It would be anomalous for the City to be liable to the instant plaintiffs for actions that the City was required to take on pain of being held in contempt at the hands of the black employees who were parties to and beneficiaries of the consent decree. This result is especially appropriate here in light of *Jefferson County*'s holding that parties in privity with or situated similarly to the instant plaintiffs knew at an early stage in the original litigation that their rights could be adversely affected, consulted with the City regarding defensive tactics, but made an "ill-advised decision" not to intervene in timely fashion deciding instead to rely on the City to advance their interests. 720 F.2d at 1516–17.

This result also is supported by an analysis of § 713(b) of Title VII, 42 U.S.C. § 2000e–12(b)(1) and the applicable EEOC regulations. Section 713(b) provides that no Title VII liability results from an employer's good faith reliance on or adherence to "any written interpretation or opinion of the Commission."[2] The relevant "written interpretation" of the EEOC[3] is 29 C.F.R.

---

**1.** Because I write only in dissent, I need not resolve the question reserved in *Jefferson County* as to whether the fact that the City merely followed the consent decree would conclusively establish that the City is not liable under Title VII.

**2.** Section 713(b) of Title VII, 42 U.S.C. § 2000e–12(b)(1) provides in relevant part:
In any action or proceeding based on any alleged unlawful employment practice, no person shall be subject to any liability or

punishment for or on account of (1) the commission by such person of an unlawful employment practice if he pleads and proves that the act or omission complained of was in good faith, in conformity with, and in reliance on any written interpretation or opinion of the Commission....

**3.** A "written interpretation or opinion of the Commission," as defined by the EEOC procedural regulations, includes "[m]atter published and specifically designated as such in the F[ederal]

§ 1608.8, which provides, in part, that "[t]he Commission interprets Title VII to mean that actions taken pursuant to the direction of a court order [including a consent decree] cannot give rise to liability under Title VII." [4] Thus, the City could rely upon the written interpretation of the EEOC to the effect that the City is precluded from retrospective Title VII liability because of its compliance with the consent decree.[5]

On the other hand, plaintiffs' claim for prospective relief will not be affected in the same way by the existence of the consent decree. In their claim for prospective relief, the validity of the consent decree is itself at issue. I agree with the opinion for the court that these plaintiffs were not parties to the prior litigation which resulted in the consent decree, and that the instant plaintiffs are not bound by the consent decree and should be free on remand to challenge the consent decree prospectively and test its validity against the recent Supreme Court precedent. *See Johnson v. Transportation Agency,* —— U.S. ——, 107 S.Ct. 1442, 94 L.Ed.2d 615 (1987).

R[egister]...." 29 C.F.R. § 1601.33(b). Here, the relevant EEOC regulation, 29 C.F.R. § 1608.8, was published in the Federal Register as part of a set of guidelines promulgated by the EEOC to "clarify and harmonize the principles of Title VII...." 29 C.F.R. § 1603.1(a). Section 1608.2 of the guidelines specified that the guidelines "constitute 'a written interpretation and opinion' of the Equal Employment Opportunity Commission as the term is used in [Section 713(b) of Title VII] and § 1601.33 of the procedural regulations of the Equal Employment Opportunity Commission...." 29 C.F.R. § 1608.2. Consequently, Section 1608.8 constitutes a "written interpretation" under Section 713(b) of Title VII.

4. 29 C.F.R. § 1608.8 provides:
 Parties are entitled to rely on orders of courts of competent jurisdiction. If adherence to an Order of the United States District Court or other court of competent jurisdiction, whether entered by consent or after contested litigation, in a case brought to enforce a federal, state, or local equal employment opportunity law regulation, is the basis of a complaint

filed under Title VII or is alleged to be the justification for an action which is challenged under Title VII, the Commissioner will investigate to determine: (a) whether such an order exists and (b) whether adherence to the affirmative action plan which is part of the order was the basis of the complaint or justification. If the Commission so finds, it will issue a determination of no reasonable cause. *The Commission interprets Title VII to mean that actions taken pursuant to the direction of a court order cannot give rise to liability under Title VII.*
 Emphasis supplied.

5. I note that the Seventh Circuit has held that a consent order does not constitute a "written interpretation or opinion of the Commission" within the meaning of § 713(b) of Title VII. *Eirhart v. Libbey–Owens Ford Co.,* 616 F.2d 278 (7th Cir.1980). That court, however, apparently overlooked the provision of the regulation upon which I rely. Instead, it evaluated the consent order under subsection (a) of 29 C.F.R. § 1601.33. My analysis is based upon subsection (b) of 29 C.F.R. § 1601.33; therefore the conclusion in *Eirhart* is inapposite to this case.