**J. Dale MANN, Plaintiff–Appellant, Cross–Appellee,**

v.

**CITY OF ALBANY, GEORGIA, A Municipal Corporation, Defendant–Appellee Cross–Appellant,**

**Washington Long, Defendant–Appellee.**

No. 88–8468.

United States Court of Appeals, Eleventh Circuit.

Sept. 15, 1989.

C. Nathan Davis, Albany, Ga., G. Stephen Parker, Southeastern Legal Foundation, Atlanta, Ga., for plaintiff-appellant.

Robert J. Delahunty, Dennis J. Dimsey, U.S. Dept. of Justice, Civil Rights Div., Appellate Section, Washington, D.C., for amicus curiae U.S.

James V. Davis, Leonard Farkas, Landau, Davis & Farkas, P.C., Thomas S. Chambless, Watson, Spence, Lowe & Chambless, Albany, Ga., for appellee/cross-appellant, City of Albany.

Chevene B. King, Jr., Albany, Ga., Ronald L. Ellis, Julius LeVonne Chambers, Judith Reed, New York City, for appellee-Long.

Before KRAVITCH and COX, Circuit Judges, and MORGAN, Senior Circuit Judge.

KRAVITCH, Circuit Judge:

J. Dale Mann, a white male, claims a violation of certain of his constitutional and statutory rights stemming from a hiring decision made by the City of Albany, Georgia, in accordance with a policy that the City adopted in response to a federal-court decree. That decree ended an anti-discrimination suit filed on behalf of black employees and job applicants of the City, *Johnson v. City of Albany*, 413 F.Supp. 782 (M.D. Ga.1976) (*Johnson*). Mann was not a party to *Johnson;* nevertheless, the district court held that Mann was barred from contesting the City's policy on grounds of *res judicata.* In the alternative, the court held that Mann had not stated a claim for relief under federal law. Concluding that the doctrine of *res judicata* does not bar Mann's claim, we remand the action for further proceedings consistent with our opinion herein and the Supreme Court's recent decision in *City of Richmond v. J.A. Croson Co.*, — U.S. —, 109 S.Ct. 706, 102 L.Ed.2d 854 (1989).

## I. *Background*

We begin with *Johnson* in order to place in context Mann's challenge to the City's employment practices. That suit arose out of a strike by black employees precipitated by the firing of an employee who had sought to unionize city workers; some of the strikers were terminated and not rehired. Six named individual plaintiffs representing a class of former, present and future black employees of the City of Albany sued the City, its Board of Commissioners, its Water, Gas and Light Commission, and several individual officials, alleging that the defendants were engaged in a pattern or practice of discrimination against black job applicants, incumbent black employees, and black dischargees. The defendants denied the allegations in the complaint. After four years of litigation culminating in a two-day trial, during which the district court undertook a detailed review of the City's hiring and employment patterns, the court concluded that "[f]rom an overall standpoint in every respect white employees and applicants for employment were favored over black employees and applicants for employment." 413 F.Supp. at 799. Finding that the illegal patterns and practices were likely to continue into the future, the district court held that the plaintiffs were "entitled to a permanent injunction against the City of Albany and the defendant officials including their successors in office." 413 F.Supp. at 800. The City did not appeal this order.

In a subsequent order, the court issued a comprehensive injunction, relevant portions of which provided as follows:

3. To further insure equal employment opportunities the defendants within 180 days shall study all employment policies, all jobs, job classifications and descriptions, rates of pay, employee benefits and seniority rules of all City of Albany employees and shall prepare and submit to the court proposed uniform employment policies, job classifications and descriptions, rates of pay,

employee benefits and seniority rules. To the extent not disapproved of by the court in writing within thirty (30) days after filing, such uniform employment policies, job classifications and descriptions, rates of pay, employee benefits and seniority rules shall be thereafter utilized by the defendants.

4. The objective of this order is to correct the imbalance in employment opportunity that now exists by first creating a plan having as a goal the achieving of a work force in which the proportion of total black employees to total white employees viewed (a) overall, (b) by job classification and description, (c) by department, and (d) by rate of pay, is at least equal to the proportion of blacks to whites in the working age population as shown by the most recent Albany, Georgia, Standard Metropolitan Area reports of the Bureau of Census. Until that objective is reached the defendants *subject only to the availability of qualified applicants*, shall fill at least one-half of all job vacancies by hiring or promoting black persons.

.　　.　　.　　.　　.

7. In filling job vacancies the person making the hiring decision shall first consider all qualified [black applicants who are currently employees of the City of Albany or who in the past were refused employment on account of race] and who have either through a current application for employment or notice to the Central Employment Office, indicated an interest in being considered....

If no such qualified priority person is willing to accept the job vacancy, the person making the hiring decision shall proceed to consider every current, pending application on file in the Central Employment Office and every present employee who has notified the Central Employment Office of a desire to be considered. From persons thus found to be qualified the job vacancy shall be filled consistent with the employment goals herein set.

.　　.　　.　　.　　.

11. Any person who believes that he has been discriminated against on account of race or that the provisions of this order have been violated, may file a written complaint with the Central Employment Office. The Central Employment Office shall investigate the complaint and seek to resolve it. Within fifteen (15) days after the complaint is filed, a report stating the nature of the complaint and the action taken on it shall be filed in the Central Employment Office and a copy of it given to the complaining party. Such reports shall be submitted to the court at regular intervals along with the other materials which the defendants are required to submit as prescribed herein. If the complaining party is not satisfied with the results as contained in the report, he or she may, within sixty (60) days of the date of receipt of the report, file a motion with the clerk of this court to have the court determine the matter. The clerk shall cause a copy of the motion to be mailed to the defendants, who shall respond to it within ten (10) days. The clerk shall then refer the motion and the response to the court. Proceedings shall thereafter be in accordance with the Federal Rules of Civil Procedure.

.　　.　　.　　.　　.

13. ... Jurisdiction continues ... for the purpose of issuing any additional orders or decrees needed to clarify or enforce this injunction or to effectuate Title VII of the Civil Rights Act of 1964.

*Johnson v. City of Albany*, Civil Action No. 1200, permanent injunction at 2–8 (M.D.Ga. Sept. 2, 1976) (footnote omitted; emphasis in original).

A number of city jobs are occupied by a single office-holder at any one given time. As it was plainly impossible to achieve a current sixty to forty per cent ratio of majority to minority workers in a "single-incumbent position," the City formulated a

policy for filling single-incumbent positions by which a qualified applicant from a racial background different from the incumbent's enjoys an absolute preference over any qualified applicant from the incumbent's racial group. The City states that this policy was submitted to the district court pursuant to paragraph three of the injunction, and, as the court never explicitly rejected the policy, the City urges that it became fully binding under the decree.

In 1985, along with three other qualified individuals, Mann applied for the position of Assistant Police Chief of the City of Albany. The City employs only one Assistant Police Chief, and the incumbent immediately prior to the vacancy was white. Pursuant to the City's policy for single-incumbent jobs, the position of Assistant Police Chief was given to appellee Washington Long, the only qualified black applicant. In response to Mann's inquiry concerning the selection procedure, the City's personnel director wrote as follows:

> In reaching the selection, the Police Chief was bound by the provisions of the [*Johnson* decree]. Specifically, one half of all job vacancies must be filled, subject to the availability of qualified applicants, by hiring or promoting black persons.
>
> Due to the previous selection being white and the fact that there was a qualified black person who applied for the job, the selection had to be black to comply with the provisions of the [*Johnson* decree]. Therefore you could not be selected for the position.

After obtaining a right-to-sue letter from the Equal Employment Opportunity Commission, Mann instituted the present suit against the City of Albany. He alleged violations of his rights secured by the equal-protection clause of the fourteenth amendment, 42 U.S.C. § 1981, 42 U.S.C. § 1983, and Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.*

The City responded with a motion to join necessary parties under Rule 19 of the Federal Rules of Civil Procedure. The City sought to join as parties-defendant both the plaintiff class in *Johnson* and appellee Long, by then the incumbent Assistant Police Chief. Mann filed a response acquiescing in the City's request to join Long as a party-defendant, but argued that the City's motion to join the *Johnson* class was premature. The district court ordered joinder of Long, but declined to join the *Johnson* class plaintiffs. No member of the *Johnson* class sought intervention.

Mann and the City subsequently filed motions for summary judgment; the district court granted the City's motion and dismissed Mann's complaint. *Mann v. City of Albany,* 687 F.Supp. 583, 587 (M.D. Ga.1988). The court held that although suit was not barred as an "impermissible collateral attack" on the *Johnson* decree, the principles of *res judicata* barred Mann from maintaining suit. Alternatively, if *res judicata* did not bar suit, summary judgment in favor of the City was nonetheless appropriate because the City's refusal to promote Mann was required by the terms of the validly drawn decree in *Johnson.*

## II. *Joinder*

 If Mann should prevail on the merits of this action, the City would be placed in a difficult position each time a vacancy arises in a single-incumbent position. A decision adverse to the City would implicate the legality of its practices regarding those positions, and would thus leave the City "subject to a substantial risk of incurring double, multiple, or otherwise inconsistent obligations" in respect to its duties under the *Johnson* decree. Fed.R. Civ.P. 19(a)(2)(ii). Under Rule 19, a person who is subject to service of process and whose joinder will not deprive the court of jurisdiction over the subject matter is to be joined as a party in the action if his presence is necessary to afford complete relief. *See Ferguson v. Thomas,* 430 F.2d 852, 860 (5th Cir.1970);[1] *Schutten v. Shell Oil*

---

1. *See Bonner v. City of Prichard,* 661 F.2d 1206, 1209 (11th Cir.1981) (in banc). The Eleventh Circuit adopted as binding precedent all decisions rendered by the former Fifth Circuit prior to October 1, 1981.

*Company,* 421 F.2d 869, 873 (5th Cir.1970) ("the defendant has the right to be safe from needless multiple litigation and from incurring avoidable inconsistent obligations").

The district court's decision not to join the *Johnson* class was informed largely by two legal determinations; one of these was incorrect, *see* Part III, and the other must be carefully reexamined in light of recent Supreme Court authority, *see* Part IV. The court's decision is reviewable for an abuse of discretion. *See* 3A Moore's Federal Practice ¶ 19.19–1 at 19–299 (1989). Under the circumstances, that discretion was abused. We accordingly vacate the district court's denial of the City's motion to compel joinder of the *Johnson* plaintiff class as a party-defendant under Rule 19(a). On remand, the district court should again consider whether this action can proceed without subjecting the City to a substantial risk of incurring double, multiple or inconsistent obligations. If it cannot, the court should compel joinder of the *Johnson* plaintiff class.

### III. *Res Judicata*

■ The City alleged *res judicata* flowing from the *Johnson* decree as an affirmative defense to Mann's complaint. Mann was not a party to the *Johnson* action; nevertheless, a factual finding that the City "virtually represented" Mann's interests in the *Johnson* litigation would render *Johnson* binding on him under the rules of *res judicata*. *See Aerojet–General Corp. v. Askew,* 511 F.2d 710, 719–20 (5th Cir.), *cert. denied,* 423 U.S. 908, 96 S.Ct. 210, 46 L.Ed.2d 137 (1975). *Cf. Martin v. Wilks,* — U.S. ——, 109 S.Ct. 2180, 2184 n. 2, 104 L.Ed.2d 835 (1989) (notwithstanding general rule that a judgment does not conclude the rights of strangers to the litigation, there is "an exception to the general rule when, in certain limited circumstances, a person, although not a party, has his interests adequately represented by someone with the same interests who is a party"). The City argues that Mann should be held its privy because of the "vigorous defense" it mounted against the *Johnson* plaintiff class's charge of discrimination. Agreeing

with the City, the district court stated as follows:

> In light of Albany's vigorous defense, the adjudication of past racial discrimination, and the non-consensual nature of the *Johnson* proceeding, the court finds that Albany did exhibit a strong interest in protecting both its hiring practices and its promotion system. This analysis leads the court to only one conclusion: Defendant Albany adequately represented the interests of Plaintiff Mann in the original *Johnson* action.

*Mann v. City of Albany,* 687 F.Supp. 583, 587 (M.D.Ga.1988). Accordingly, the court held Mann a privy of the City bound by *res judicata* to the terms of the *Johnson* decree.

■ This holding was in error. A prior litigant's effort to champion the position asserted by another in a subsequent action is a factor to consider in determining whether the later party is a privy of the earlier party, *see Aerojet–General,* 511 F.2d at 719, but this factor alone has never been considered sufficient to warrant denying the later party his day in court. *See generally* 18 C. Wright, A. Miller & E. Cooper, Federal Practice and Procedure § 4457 at 495 (1981) ("All of the cases that in fact preclude relitigation by a nonparty have involved several factors in addition to apparently adequate litigation by a party holding parallel interests."). *Cf. In re Birmingham Reverse Discrimination Employment Litigation,* 833 F.2d 1492, 1499 (11th Cir.1987) (noting that city did not mount a "vigorous defense" to charge of race discrimination, but relying on several other factors to conclude that white plaintiffs were not bound by consent decree to which city was a party) (*Birmingham*), *aff'd sub nom. Martin v. Wilks,* — U.S. ——, 109 S.Ct. 2180, 104 L.Ed.2d 835 (1989). Moreover, it is far from clear that the "vigorous defense" undertaken by the City in *Johnson* had anything to do with the allegations of the present complaint. Mann does not seek to upset the *Johnson* court's finding that the City of Albany discriminated against black employees and job seekers; Mann attacks the City's policy

concerning single-incumbent positions. The City has offered nothing to show that it defended against the imposition of such a policy or that the policy's validity was otherwise put through meaningful adversarial testing.

Even had the City litigated the validity of its single-incumbent policy during the *Johnson* suit, the relevance of *res judicata* would remain doubtful because the personal interest in employment that Mann seeks to vindicate in the present litigation differs from the bundle of interests defended by the City in *Johnson*. In *Birmingham*, an action brought by white city employees to challenge a consent decree remedying past racial discrimination practiced by the city as an employer, we discussed similar concerns:

> [I]t is not clear that the plaintiffs and the City shared any identity of interest at all. The City's various interests in this dispute conceivably may have conflicted in part with the plaintiffs' single interest in preserving preexisting promotion opportunities. Indeed, the City's interests were antagonistic in that it had every reason to avoid a determination of liability and little reason to object to the promotion aspect of the settlement. The settlement did not require the City to make any additional promotions, but only to reallocate the promotions that it would have made in any event. In real terms, the relief contemplated by the decrees was to come not from the hands of the City, but from the hands of the employees who would have otherwise received the promotions. At the very least, the City was in the position of a disinterested stakeholder with respect to the contested promotions. Given the disparate interests of the City and the individual plaintiffs, it is clear that the City could not have served as an effective surrogate for the individual plaintiffs' interests when it negotiated the plan incorporated into the consent decrees. Accordingly, it would be impossible to conclude that these plaintiffs are in any way bound by those decrees.

833 F.2d at 1499. The major concern highlighted by the *Birmingham* court stands in this case. Like the City of Birmingham, the City of Albany was not enjoined to create new jobs, but only to grant a preference to minority job applicants. Like Birmingham, then, the City of Albany occupied a position analogous to that of a disinterested stakeholder in an interpleader action. The City of Albany may have mounted more of a defense to a determination of liability (although Birmingham did not admit liability, *see Birmingham*, 833 F.2d at 1494), but the mere fact that Albany was not willing to acknowledge the patent illegality of the regrettable practices documented by the *Johnson* court has little effect on our determination that the City of Albany's interests in *Johnson* were not congruent with the interests Mann presently asserts. Moreover, the City had no legal duty steadfastly to support the interests of a particular group of job-seekers; if anything, the City was under a legal obligation to treat all job-seekers even-handedly. *Pollard v. Cockrell*, 578 F.2d 1002, 1008 (5th Cir.1978) (*res judicata* under a theory of virtual representation "demands the existence of an express or implied legal relationship in which parties to the first suit are accountable to non-parties who file a subsequent suit raising identical issues").

As extension of the preclusion doctrine would impair the ability of Mann and others similarly situated to protect their civil rights in federal court, we are unpersuaded that a different result should obtain simply because *Johnson* was a civil-rights case. *Cf. Birmingham*, 833 F.2d at 1498 ("Although we also recognize the strong public policy in favor of voluntary affirmative action plans, we have rejected the ... doctrine [preventing collateral attacks by nonparties to Title VII consent decrees] 'to the extent that it deprives a non-party to the decree of his day in court to assert the violation of his civil rights.'" (*quoting United States v. Jefferson County*, 720 F.2d 1511, 1518 (11th Cir.1983)). In a case such as the present one with civil-rights interests on both sides of the controversy, civil-rights values in general would not be furthered by a more encompassing approach to *res judicata*. The district court's

implicit determination that the City's interests in *Johnson* were virtually representative of Mann's interests was thus erroneous, and the doctrine of *res judicata* does not bar Mann's claim.[2]

### IV. *Reverse Discrimination*

■ Although *res judicata* does not bar Mann from maintaining suit, this conclusion does not by itself compel reversal as the district court also held that Mann failed to carry his summary-judgment burden of proffering enough facts to state a claim of reverse discrimination. Because of the potential absence of necessary parties, *see supra* Part II, and also because of the unclear circumstances surrounding the adoption of Albany's single-incumbent policy, *see infra* note 3, we decline to fully review the propriety of summary judgment. Instead, we vacate the district court's decision that Mann failed to state a claim, and, without foreclosing a full airing of the question on remand, we request the court to consider the applicability of the Supreme Court's decision in *City of Richmond v. J.A. Croson Co.,* —— U.S. ——, 109 S.Ct. 706, 102 L.Ed.2d 854 (1989), which was delivered after the order in the present case.

In *Croson,* the Supreme Court invalidated a voluntary affirmative-action program implemented by the City of Richmond, Virginia, that required prime contractors awarded city construction contracts to subcontract at least thirty per cent of the dollar amount of the prime contract to one or more minority-owned business enterprises. As the City of Albany pointed out at oral argument, the facts of *Croson* are distinguishable from the facts of the instant case because the affirmative-action program here involved was to some degree implemented under the auspices of a federal district court. Bearing that distinction in mind, we draw the district court's atten-

tion to the language with which the *Croson* Court distinguished *Fullilove v. Klutznick,* 448 U.S. 448, 100 S.Ct. 2758, 65 L.Ed.2d 902 (1980) (upholding a congressional set-aside program for minority-owned businesses). A majority of the justices expressed clear hostility toward government affirmative-action programs that distribute opportunities woodenly and inflexibly on the basis of an applicant's race:

> [T]he 30% quota cannot be said to be narrowly tailored to any goal, except perhaps outright racial balancing. It rests upon the "completely unrealistic" assumption that minorities will choose a particular trade in lockstep proportion to their representation in the local population. See *Sheet Metal Workers v. EEOC,* 478 U.S. 421, 494, 106 S.Ct. 3019, 3060, 92 L.Ed.2d 344 (1986) (O'CONNOR, J., concurring in part and dissenting in part) ("[I]t is completely unrealistic to assume that individuals of one race will gravitate with mathematical exactitude to each employer or union absent unlawful discrimination").

> Since the [City of Richmond] must already consider bids and waivers [for work on construction contracts] on a case-by-case basis, it is difficult to see the need for a rigid numerical quota.... [T]he congressional scheme upheld in *Fullilove* allowed for a waiver of the set-aside provision [for minority-owned businesses] where [a minority-owned business's] higher price was not attributable to the effects of past discrimination. Based upon proper findings, such programs are less problematic from an equal protection standpoint because they treat all candidates individually, rather than making the color of an applicant's skin the sole relevant consideration. Unlike the program upheld in *Fullilove,* the Richmond Plan's waiver system focuses solely on the availability of [minority-owned businesses]; there is no inquiry

---

2. The City argues that Mann should be compelled to intervene in the *Johnson* litigation, over which the district court maintains continuing jurisdiction. *See* ¶¶ 11 & 13, *supra* p. 5. The Supreme Court's decision in *Martin* expressly eschews a regime of mandatory intervention. *See* 109 S.Ct. at 2185 ("a party seeking a judg-

ment binding on another cannot obligate that person to intervene; he must be joined"). Additionally, paragraph 11 of the *Johnson* injunction does not *require* non-parties to intervene in the *Johnson* litigation; it merely establishes an administratively convenient procedure for those complainants who wish to make use of it.

into whether or not the particular [minority-owned business] seeking a racial preference has suffered from the effects of past discrimination by the city or prime contractors.

Given the existence of an individualized procedure, the city's only interest in maintaining a quota system rather than investigating the need for remedial action in particular cases would seem to be simple administrative convenience. But the interest in avoiding the bureaucratic effort necessary to tailor remedial relief to those who truly have suffered the effects of prior discrimination cannot justify a rigid line drawn on the basis of a suspect classification.... Under Richmond's scheme, a successful black, Hispanic, or Oriental entrepreneur from anywhere in the country enjoys an absolute preference over other citizens based solely on their race. We think it obvious that such a program is not narrowly tailored to remedy the effects of prior discrimination.

*Croson,* 109 S.Ct. at 728–29 (O'Connor, J., with Rehnquist, C.J., White, Stevens, and Kennedy, JJ., concurring). Federal power to eliminate the effects of past discrimination achieves its zenith in section five of the fourteenth amendment with an explicit grant of authority to Congress. "It is fundamental that in no organ of government, state or federal, does there repose a more comprehensive remedial power than in the Congress, expressly charged by the Constitution with competence and authority to enforce equal protection guarantees." *Fullilove,* 448 U.S. at 483, 100 S.Ct. at 2777 (plurality opinion) (contrasting "the limited remedial powers of a federal court ... with the broad remedial powers of Congress"). As it distinguishes the merits of the *Fulli-*

*love* plan from the merits of the *Croson* plan without relying solely on the ground that *Fullilove* involved congressional action, the language from *Croson* quoted above may be applicable to race-based classifications imposed by Congress, and *a fortiori* to any such classification practiced by an inferior branch of federal or state government.

Finally, we do not decide whether Albany's policy should be reviewed as a judicially imposed plan, as a plan adopted by a local government, or as a hybrid of the two; nor do we express any opinion whether the distinction is relevant to Mann's cause of action. *Cf. United States v. Paradise,* 480 U.S. 149, 107 S.Ct. 1053, 1075 n. 2, 94 L.Ed.2d 203 (1987) (Powell, J., concurring) (suggesting that legislative plans and court decrees are to be reviewed under an identical standard); *id.,* 107 S.Ct. at 1077 n. 1 (Stevens, J., concurring in the judgment) (suggesting that different standards apply to review of state executive or legislative action and review of federal judicial decrees); *id.,* 107 S.Ct. at 1080 (O'Connor, J., dissenting) (suggesting application of strict scrutiny to a federal-court decree). Any differences between an affirmative-action plan adopted by a local government and a plan imposed by a federal-court decree may not be dispositive of the instant case because of the peculiar circumstances attending the genesis of Albany's single-incumbent policy. Regardless, after the district court more fully develops these facts on remand,[3] it should have the initial opportunity to decide what standard of review is suited to the particular circumstances presented. *Compare Croson,* 109 S.Ct. at 720–21 (O'Connor, J., with Rehnquist, C.J., White and Kennedy, JJ., concurring; Sca-

---

**3.** The district court found as follows: "Pursuant to Paragraph 3 of the [*Johnson*] Order, ... any employment policy established by Albany and not disapproved of by [the *Johnson* court] was implicitly approved and adopted by the Order." *Mann v. City of Albany* 687 F.Supp. 583, 586 (M.D.Ga.1988). On remand, the district court should to the extent possible make specific findings as to when the single-incumbent plan was submitted to the *Johnson* court, whether the plan was developed by the City alone or perhaps with advice from or at the suggestion of the

*Johnson* court or the plaintiff class, and whether the plan was the subject of any adversarial process during any stage of the *Johnson* litigation. Additionally and to the extent possible, the district court should determine whether the *Johnson* court rejected any of the proposals submitted by the City pursuant to paragraph 3 of the injunction; and if so, the district court should identify the reasons for such rejection. Specific findings along these lines may help to arrive at a proper standard of review and aid any future appellate review.

lia, J., concurring separately) (plan adopted by city council; strict scrutiny applicable) *with Paradise*, 107 S.Ct. at 1064 (plurality opinion of Brennan, Marshall, Blackmun and Powell, JJ.) (direct review of federal-court decree; "elevated level of scrutiny" applicable). *Cf. Croson*, 109 S.Ct. at 735 (Scalia, J., concurring in the judgment) ("I agree with much of the Court's opinion, and, in particular, with its conclusion that strict scrutiny must be applied to all governmental classification by race"); *id.*, 109 S.Ct. at 732 (Stevens, J., concurring in part and concurring in the judgment) (declining to "engag[e] in a debate over the proper standard of review to apply in affirmative-action litigation").

REMANDED.