**Eugene HENRY, et al., Plaintiffs,**

v.

**CITY OF GADSDEN, ALABAMA, et al., Defendants.**

**Civ. A. No. 87–C–1338–M.**

United States District Court, N.D. Alabama, M.D.

June 30, 1989.

---

**1066**

Clarence F. Rhea and Donald R. Rhea, Rhea Boyd & Rhea, Gadsden, Ala., for plaintiffs.

George P. Ford, Simmons Ford & Brunson, Gadsden, Ala., for defendants.

## MEMORANDUM OF OPINION

CLEMON, District Judge.

In *Martin v. Wilks,* — U.S. ——, 109 S.Ct. 2180, 104 L.Ed.2d 835 57 U.S.L.W. 4616 (1989), a sharply divided United States Supreme Court held that white firefighters may collaterally attack an otherwise valid consent decree entered in settlement of claims of systemic, classwide discrimination against blacks. This case is a paradigmatic collateral attack on a consent decree providing for a one-to-one hiring ratio of black and white firefighters in the City of Gadsden, Alabama. Since the challenged consent decree passes the two-prong test of *In re Birmingham Reverse Discrimination Employment Litig.,* 833 F.2d 1492 (11th Cir.1987) with flying colors, the attack fails —and it fails miserably.

### I.

Blacks comprise roughly twenty percent of the population of the City of Gadsden. Prior to 1979, there had never been a black firefighter in Gadsden. A year earlier, Jimmy Poe and the Southern Christian Leadership Conference (SCLC) filed suit against the city and its Civil Service Board, alleging that blacks had not been hired as firefighters because of their race. After a period of discovery, the case was settled by a consent decree.

### II.

The consent decree provides, among other things, that Jimmy Poe be appointed as a firefighter and that he be given $500.00 as backpay. It further provides for the continued use of "a written civil service qualifying examination comparable to those used by [the Gadsden Civil Service Board] in 1975 and 1977."[1] A firefighter applicant's score on the written portion of the exam counts for half (50%) of his overall score. The other half of the overall score is attributed to an interview of the applicant, conducted and evaluated by a three-person, bi-racial Fire Department Personnel Board. The overall scores of applicants are then compiled on eligibility lists. These eligibility lists are maintained by race. From these two lists, the City of Gadsden is required to "... hire one black for every white hired until the Fire Department is

---

1. These examinations have not been validated under the Uniform Employee Guidelines and Testing Procedures, 29 CFR 1607 (1988).

substantially desegregated." [2]  If the black eligibility list is exhausted, then "the defendants may be temporarily relieved of the one-to-one hiring requirement."

There are four levels of progression in the department: firefighter, driver, commander, and assistant chief.  After a new hire has served a six-months' probationary term as a rookie, she becomes a firefighter. The next higher job classification is that of driver.  In order to become a driver, a firefighter must first pass a written test and then take on the job training.  After the firefighters pass the driver examination and complete their training, they are chosen for driver vacancies on the basis of seniority.  Commanders are chosen from the pool of qualified drivers, again based on seniority.  Finally, the assistant fire chief is chosen from a pool of the six commanders with greatest seniority.

Seniority is a determining factor in promotions and transfers at the Gadsden Fire Department where competency is relatively equal.  Layoffs, reductions in force, demotions, station assignments, and vacation preferences are also based on seniority, other things being equal.

Historically, the City's policy with respect to the seniority status of employees hired the same day has varied.  For example, when the former Fire Chief, William G. Mayo, took the firefighter's test in 1966, he made the highest score of the three who took the exam.  They were all hired the same day, but the names of the lower-scoring firefighters were placed ahead of that of Mayo.  Sometime after the entry of the consent decree, the policy evolved that employees hired on the same day would be ranked on the seniority roster in order of their relative examination scores.  Blacks would first be ranked in order of their examination scores; and whites thereafter would be similarly ranked on the seniority roster.

**2.** In determining what constitutes "substantial desegregation," Gadsden's twenty percent black population is taken into consideration, under the express terms of the consent decree.

## III.

The following chart reflects the hiring of firemen by the Gadsden Fire Department during the first six years of the consent decree:

| Year | Blacks Hired | Whites Hired | Total |
| --- | --- | --- | --- |
| 1979 | 6 | 13 | 19 |
| 1980 | 3 | 10 | 13 |
| 1981 | 0 | 13 | 13 |
| 1982 | 1 | 4 | R5 |
| 1983 | 0 | 0 | 0 |
| 1984 | 0 | 3 | 3 |
| Total | 10 | 43 | 53 |

During this span of years, few blacks passed the written test.  The Fire Chief filled the vacancies as they occurred with qualified whites, but he did so with the understanding that as blacks were certified on the eligibility lists, they would be hired in such a way as to maximize the desegregation of the Fire Department.  In fact, the Civil Service Board specifically directed him to hire the qualified blacks ahead of the qualified whites.

Between May 18, 1980, and April 30, 1985, 29 whites and one black were hired by the Fire Department.  Thus, when vacancies occurred in 1985, and qualified blacks were available, the defendants decided in good faith to first fill as many vacancies as possible with black firefighters.  For the eleven vacancies which occurred in the spring of 1985, the Fire Department hired four black and seven white firefighters on the same day.  The names of the four blacks were placed on the seniority roster ahead of the seven whites.

In the summer of 1985, the Fire Department filled nineteen vacancies—again all on the same day.  Consistent with the defendants' policy of hiring the qualified blacks first, the twelve black firefighters were placed on the seniority roster ahead of the seven whites.  Each of the whites had scored higher than all of the blacks on the civil service examination.[3]  Plaintiffs were among the seven whites hired that

**3.** On the eligibility list of white applicants were 36 persons who scored higher than the 23 persons on the black eligibility list.  If hiring had been based solely on test scores, then probably none of the blacks would have been hired.

day; and it is their relative placement on the seniority roster which gives rise to this lawsuit.

The same result would have obtained if the Fire Chief had hired the black firefighters on one day and the white firefighters on the next. In any event, the decisionmakers were determined to hire the qualified black applicants first, in order to correct a "manifest imbalance" in the representation of blacks on the workforce of the Gadsden Fire Department.

## IV.

Since the plaintiffs were hired, all of them have passed the driver examination. Seven of the twelve blacks have either not passed the driver examination or their employment has been terminated. While the plaintiffs have worked as temporary drivers, none of the blacks have been promoted to the driver position. Moreover, since April 1987, seniority has become less important than station assignments in determining promotions to the position of temporary driver, which affords the greatest opportunity for driver training. There is a minimum manning level at each station; and vacancies are first filled by firefighters assigned to the particular station, rather than by firefighters with greater seniority but assigned to other stations.

The earnings data submitted by plaintiffs [4] completely demolish any claim that they have suffered damages as a result of their relative placement on the seniority roster. Of the nineteen employees hired on August 5, 1985, J.C. Kilgore—a plaintiff—has earned the largest amount of wages. In fact, the plaintiffs' average yearly earnings between 1985–1988 was $66,310.98. *The black firefighters* who were hired on the same day but ahead of them *earned, on the average, six thousand dollars less.*[5] In overtime earnings over the same period,

the plaintiffs averaged $5,360.44, while the black firefighters averaged $4,834.00.

## V.

▮ The guiding legal principles are set forth in *Birmingham Reverse Discrimination Litig., supra.* To overcome a "reverse discrimination" challenge to a consent decree which embodies race-conscious selection criteria, the proponents of the decree must prove that (1) consideration of the race of the applicant is "justified by the existence of a 'manifest imbalance' that reflected underrepresentation" of blacks in traditionally segregated jobs, and (2) the decree must not "unnecessarily trammel" the rights of white employees or "create an absolute bar to their advancement." *Id.,* at 1500. These principles are easily applied to the facts at hand.

▮ First, it is clear beyond cavil that prior to the consent decree, there was a manifest imbalance in the representation of blacks in the traditionally segregated jobs of the Gadsden Fire Department. It was not merely a question of underrepresentation—there were and had been no blacks, the inexorable zero—in the Gadsden Fire Department. A *prima facie* case would have been established by this egregious absence of blacks.[6]

Second, the evidence belies any notion that the consent decree either unnecessarily trammels the rights of the white firefighters or creates an absolute bar to their advancement. The facts reveal precisely the opposite. They had no right to be placed on the seniority roster ahead of the blacks who were hired ahead of them. And despite their relative placement on the seniority roster, the plaintiffs have already been positioned so that, in all likelihood, they will be promoted to the position of driver ahead of the blacks against whom they complain. And if that were not enough, the proverbial proof of the pud-

---

**4.** Plaintiffs' Exhibit 7.

**5.** The actual average earnings of the black firefighter was $60,190.40. This figure excludes the two black firefighters no longer employed by the Gadsden Fire Department.

**6.** The Court judicially notes that according to the 1980 Census, there were 3,032 blacks in the Gadsden Standard Metropolitan Statistical Area who had completed high school. 1980 *Census of Population and Housing.* Census Tracts. Gadsden, Ala. PHC80–2. P–41.

ding is that the plaintiffs' earnings are substantially higher than those of the more senior black firefighters hired on the same day as they were hired.[7] In short, no rights of the plaintiffs have been trammeled, unnecessarily or otherwise; the consent decree has not impeded their advancement in any way.

By separate order, judgment shall be entered in favor of defendants and against the plaintiffs.

### FINAL JUDGMENT

Based on the accompanying Memorandum of Opinion, FINAL JUDGMENT is hereby ENTERED in favor of defendants CITY OF GADSDEN, ALABAMA; CIVIL SERVICE BOARD OF THE CITY OF GADSDEN, ALABAMA; NESTOR KAMPAKIS, JOHNNY FLENOR and PAUL NICHOLS, individually and in their official capacities and against plaintiffs EUGENE HENRY, MIKE BOLTON, JIMMY KILGORE, GARY SANDERS, and RANDY BEDDINGFIELD.

The costs of this action are hereby taxed against plaintiffs, for which execution shall issue.

DONE this 30th day of June, 1989.

---

**7.** It is not unrealistic to assume that the black firefighters would gladly exchange their posi- tions on the seniority roster and earnings for those of the plaintiffs.